**In re BOX BROTHERS HOLDING COMPANY, Debtor (three cases).**

**B.R. GRIFFIN, David H. Hawk, James A. Lyle, Hayden McIlroy, and J.R. Simplot, Appellants,**

v.

**BOX BROTHERS HOLDING COMPANY, Appellee (three cases).**

**Civil Action Nos. 95–267 MMS, 95–276 MMS and 95–341 MMS.**

United States District Court, D. Delaware.

March 4, 1996.

Francis J. Trzuskowski of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, Delaware; Of Counsel: Richard H. Greener and Joseph M. Meier of Cosho, Humphrey, Greener & Welsh, P.A., Boise, Idaho; Jay W. Ungerman and Jeffrey M. Sherman of Ungerman & Ungerman, P.C., Dallas, Texas; for Appellants.

Teresa K.D. Currier and Michelle E. Shriro of Duane, Morris & Heckscher, Wilmington, Delaware; Of Counsel: John B. Atwood III and Dean M. Gandy of Creel & Atwood, P.C., Dallas, Texas; for Appellee.

Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, Delaware; Of Counsel: Russell L. Munsch of Russell Hardt Kopf Harr & Dinan, P.C., Dallas, Texas; for Comercia Bank–Texas (Amicus in Civil Action No. 95–276).

MURRAY M. SCHWARTZ, Senior District Judge.

### *OPINION*

### I. Introduction

The appeals and motions before the Court, supported by a voluminous record and extensive briefing, arise out of the alleged fraudulent transfer of stock valued at approximately $43 million from the Estate of Cloyce K. Box, the patriarch of a Texas oil and gas family, to a holding company called Box Brothers Holding Company ("BBHC" or "Debtor"), in an alleged attempt to defraud judgment creditors of Cloyce K. Box. B.R. Griffin, David H. Hawk, James L. Lyle, Hayden McIlroy, and J.R. Simplot (collectively, "Appellants"), as derivative plaintiffs, won a $22 million judgment against Cloyce K. Box, but were unable to collect their judgment as a result of the alleged fraudulent transfer. BBHC, the transferee of the stock, is an entity controlled by two sons of Cloyce K. Box. Shortly after the transfer, BBHC entered into voluntary Chapter 11 proceedings under the Bankruptcy Code. Appellants filed numerous motions and objections to the bankruptcy proceedings in an effort to recover on the judgment. Jurisdiction over the matter in Bankruptcy Court was proper under 28 U.S.C. § 157, as a core proceeding arising under title 11 of the United States Code, and arising in a case under title 11 of the United States Code. *See* 28 U.S.C. §§ 157(b)(2)(A), (H), (M) and (O).

Appeals arising from the disposition of these motions have been taken by Appellants, and BBHC has moved to dismiss two of the appeals. This Court has jurisdiction to hear appeals from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). Briefing was completed, including an amicus curiae filing by Comerica Bank–Texas ("Comerica"), a BBHC creditor, and oral argument was held on November 21, 1995. For the reasons set forth below, the Court will grant BBHC's Motion to Dismiss the Adversary Appeal and Motion to Dismiss the Confirmation Appeal on the grounds of mootness. The Adversary Appeal and the Confirmation Appeal will be dismissed. The Court will also affirm the Bankruptcy Court's denial of the Proof of Claim.

### II. Facts

The motions and appeals come to this Court after nearly seventeen months of consideration by the Bankruptcy Court. The underlying facts are not in dispute. The events giving rise to the present posture of the case stem from a multi-million dollar judgment awarded in favor of Appellants. Appellants, shareholders of Box Energy Corporation ("Box Energy"), a publicly held oil and gas business,[1] brought suit against Cloyce K. Box and other entities controlled by Cloyce K. Box for breach of fiduciary duty, breach of covenant of good faith and fair dealing, and other unlawful activities, in federal court in Texas. On October 29, 1992, after a 25 day trial, the jury awarded over $22 million in damages to Appellants. At present, the amount of the judgment exceeds $54 million, the increase resulting from accrued and accruing pre- and post-judgment interest, fees and costs. Two months after the verdict, Cloyce K. Box executed a security agreement which purported to transfer certain stock, his most significant asset, to BBHC. BBHC is a holding company which holds a variety of subsidiaries owned or controlled by the Box family, including a controlling stock interest in Box Energy. After Cloyce K. Box's death, the security agreement was foreclosed upon, effecting the transfer. Once the stock was transferred out of the Cloyce K. Box Estate to BBHC, two sons of Cloyce K. Box, Don D. Box and Thomas D. Box, as officers and directors of BBHC, caused BBHC to file for Chapter 11 protection under the Bankruptcy Code on

---

1. Appellants were, at the time of the shareholder litigation, shareholders of an entity called "OKC Limited." OKC Limited is the predecessor to Box Energy.

August 1, 1994, in an alleged attempt to avoid liability to Appellants. BBHC acted as a debtor-in-possession throughout its Chapter 11 proceedings pursuant to Bankruptcy Code §§ 1107 and 1108. *See* 11 U.S.C. §§ 1107, 1108.

## A. *The Adversary Complaint*

On October 17, 1994, Appellants filed a Complaint and Application for Section 105 Injunction, initiating Adversary Proceeding No. A–94–130 (the "Adversary Complaint"). Civil Action ("C.A.") No. 95–276 App. at Exhibit ("Exh.") 1.[2] Appellants sought the avoidance of the transfer from the Estate of Cloyce K. Box of 1,840,525 shares of Class A (voting) common stock of Box Energy ("Class A Stock"), 552,748 shares of Class B (non-voting) common stock of Box Energy ("Class B Stock"), and 10 shares of Class A common stock of BBHC, and to further enjoin the transfer of any and all assets of BBHC. C.A. 95–276 App. at Exh. 1. Appellants alleged that such stock was fraudulently conveyed to the Debtor and the transfer therefore should be avoided. The Debtor moved pursuant to Federal Rule of Bankruptcy Procedure 7012(b)(6) to dismiss the Adversary Complaint, alleging that the bankruptcy strong arm powers of 11 U.S.C. § 544 prevailed over any claimed right of Appellants to the stock as alleged in the Adversary Complaint. C.A. 95–276 App. at Exh. 5.

The Adversary Complaint was dismissed with prejudice by the Bankruptcy Court by Order dated February 6, 1995 ("Order Dismissing the Adversary Complaint"). C.A. 95–276 App. at Exh. 9. Following the entry of the Order, Appellants filed a Motion for Clarification, To Amend or Alter Judgment and For a New Trial. C.A. 95–276 App. at Exh. 11. The Motion was denied on March 14, 1995. C.A. 95–276 App. at Exh. 15. An appeal of the Order Dismissing the Adver-

sary Complaint was filed on March 21, 1995 ("Adversary Appeal"). C.A. 95–276 App. at Exh. 16. *See Griffin, et al. v. Box Bros. Holding Co.,* C.A. No. C.A. 95–276 (MMS). Appellants then filed a Motion for Stay pending the outcome of the Adversary Appeal.[3] The Motion for Stay was denied by the Bankruptcy Court by Order dated March 29, 1995, and by the District Court by Order dated April 13, 1995. On June 1, 1995, BBHC filed a Motion to Dismiss the Adversary Appeal on the ground that substantial consummation of the confirmed Reorganization Plan had occurred. Comerica, a BBHC creditor, filed an amicus curiae brief in support of BBHC's Motion to Dismiss. *See* Docket Item ("D.I.") 12 at Exh. A.

## B. *The Proof of Claim*

On November 14, 1994, Appellants filed a Proof of Claim in BBHC's bankruptcy case (the "Proof of Claim"), attaching the Adversary Complaint thereto, ostensibly for the purpose of referencing the factual record concerning the alleged fraudulent transfer. C.A. 95–267 App. at Exh. C. On February 2, 1995, BBHC filed an Omnibus Objection to Certain Proofs of Claim in which it objected to Appellants' Proof of Claim. C.A. 95–341 App. at Exh. 6. On March 9, 1995, the Bankruptcy Court granted BBHC's Objection with respect to Appellants' Proof of Claim. C.A. 95–341 App. at Exh. 18. On March 15, 1995, Appellants filed a notice of appeal of the denial of their Proof of Claim ("Proof of Claim Appeal"), *see* C.A. 95–267 D.I. 1, and that appeal is currently before this Court. *See Griffin, et al. v. Box Bros. Holding Co.,* C.A. No. 95–267 (MMS). Appellants then filed a Motion for Stay pending the outcome of the Proof of Claim Appeal. The Motion for Stay was denied by the Bankruptcy Court by Order dated March 29, 1995, and by the District Court by Order dated April 13, 1995.

---

2. Because this opinion addresses three separate appeals and related motions, there are three appellate records from which the facts are taken. Accordingly, the citations refer to the individual appellate records by Civil Action number. The same system of notation will be utilized for citations to Docket Items.

3. A companion Motion for Stay was also filed to stay BBHC's bankruptcy proceedings until the Proof of Claim Appeal could be decided. *See infra.* This motion was also denied by the Bankruptcy Court and the District Court, by Order of Chief Judge Longobardi.

### C. *The Reorganization Plan*

On October 21, 1994, BBHC filed a plan of reorganization which set forth the details of the distribution of assets. C.A. 95–341 App. at Exh. 2. A first amended plan of reorganization was filed on March 7, 1995 (the "Plan" or the "Reorganization Plan"). C.A. 95–341 App. at Exh. 16. Pursuant to the Plan, BBHC had 30 days following the Confirmation Order to consummate its plan. C.A. 95–341 D.I. 8 (Affidavit of Jill Killam at ¶ 4). The Plan provided for detailed and complicated transactions which included the extension of a $4.5 million secured line of credit from Comerica, in exchange for the release of liens on certain classes of stock. *Id.* ¶¶ 6, 10. The Plan also provided for the dismissal with prejudice of litigation pending against BBHC by creditors, including Trammell Crow and Crow Cement Company (collectively, the "Crow Creditors"), in exchange for the transfer of shares of Class B stock and a secured note for $6.5 million. *Id.* ¶¶ 13, 15. Further, the Plan directed for disbursement of a 25% payment of each of the allowed claims of unsecured creditors. C.A. 95–341 D.I. 21 (Supplemental Affidavit of Jill Killam at ¶ 6). A hearing on the confirmation of the Reorganization Plan was scheduled for April 13, 1995.

Appellants filed an Objection to the Confirmation of BBHC's Reorganization Plan on April 7, 1995 (the "Objection to Plan"). C.A. 95–341 App. at Exh. 19. On April 11, 1995, BBHC filed a Motion to Strike Appellants' Objection to Plan on the ground that Appellants had no standing to participate in the confirmation proceedings. The Bankruptcy Court determined that Appellants had no standing and granted BBHC's Motion to Strike on April 13, 1995. That Order has not been appealed, nor was a motion brought to stay the confirmation of the Plan. On that same date, the Bankruptcy Court entered an Order confirming BBHC's First Amended Plan of Reorganization (the "Confirmation Order"). C.A. 95–341 App. at Exh. 21. On April 24, 1995, Appellants filed a notice of appeal of the Confirmation Order, and this appeal is currently before the Court (the "Confirmation Appeal"). *See Griffin, et al. v. Box Bros. Holding Co.*, C.A. No. 95–341 (MMS). On May 10, 1995, Killam filed a Certification with the Bankruptcy Court certifying that BBHC had achieved substantial consummation of the Plan. *Id.* ¶ 5.

### III. Analysis

### A. *The Adversary Appeal and Motion to Dismiss Adversary Appeal* [4]

Appellants filed the Adversary Complaint on October 17, 1994, seeking the avoidance of transfers of certain Box Energy stock, and to prevent the further transfer of any such stock. App. at Exh. 1. BBHC filed a Motion to Dismiss the Adversary Complaint pursuant to Bankruptcy Rule 7012(b)(6), and a hearing was held on the matter. On February 6, 1995, the Bankruptcy Court dismissed the Adversary Complaint with prejudice. *Id.* at Exh. 9. The Bankruptcy Court held that the strong arm provisions of 11 U.S.C. § 544(a), which accrue to a debtor who remains in possession of the estate, as is the case here, preclude recovery by Appellants. *Id.* at ¶ 9. The Bankruptcy Court further held that even assuming that Appellants could prove a constructive trust, the constructive trust would arise in favor of the Estate of Cloyce K. Box, not of Appellants, and thus, Appellants could not attempt to "sit in the shoes of the Estate" to recover on their judgment. *Id.*[5] On February 16, 1995, Appellants filed a Motion for Clarification, to Alter or Amend Judgment and for New Trial. App. at Exh. 10. The Motion was denied on March 14, 1995. *Id.* at Exh. 15.

Appellants filed an Adversary Appeal alleging that the Bankruptcy Court erred by finding that (1) Appellants had no standing to

---

**4.** All citations to Docket Items and Appellate records in this section refer to Civil Action No. 95–276 (MMS).

**5.** The Adversary Complaint also raised a breach of fiduciary duty claim and a claim for pre-judgment and post-judgment interest on damages. Because those claims were brought against non-debtor entities, they were dismissed without prejudice for lack of subject matter jurisdiction. *Id.* ¶¶ 11, 12.

set aside the transfer; (2) the strong arm provisions of 11 U.S.C. § 544 void any constructive trust which arises before the petition date; and (3) the strong arm provisions apply to transfers of personal property to the Debtor where as of the petition date, the Debtor held legal title. D.I. 5 at 1. BBHC responded to these arguments by asserting, *inter alia,* that the Bankruptcy Court correctly interpreted the strong arm provisions, which allow the avoidance of constructive trusts on personal property, and in this case, void any constructive trust impressed upon the property. D.I. 9.

■ BBHC also filed a Motion to Dismiss the Adversary Appeal. D.I. 6. BBHC urges the Court to dismiss the Adversary Appeal on the grounds of mootness. BBHC argues that no court could grant Appellants the relief sought because a substantial portion of the stock has been transferred to other creditors in satisfaction of their claims. D.I. 7. Appellants, on the other hand, argue that the appeal is not moot.[6] *See* D.I. 10. Appellants argue that the Debtor's confirmed Reorganization Plan does not sell, transfer, or put any of the disputed stock beyond the reach of effective relief. The creditors to whom transfers have been made in reliance on the confirmed plan, Appellants assert, were parties in the Adversary Proceeding, and are therefore not third party investors who relied upon the Plan to their detriment. Accordingly, Appellants urge the Court to dismiss the Motion to Dismiss the Adversary Appeal with prejudice. Because the Adversary Appeal and the Motion to Dismiss the Adversary Appeal turn on the same issues, the two will be treated together.

The briefs filed by the parties to this action are replete with legal analysis, and both sides consume much paper attempting to factually and legally distinguish the authority proffered by the other. However, the Third Circuit Court of Appeals has recently ruled on the mootness issue in the context of bankruptcy appeals. *See In re Continental Airlines,* No. 94–7748, 75 F.3d 868, 1996 WL 47653 (3d Cir. Feb. 7, 1996). The Court's analysis in the case *sub judice* is governed by that analysis.

In *Continental Airlines,* the Third Circuit Court of Appeals reviewed the decision of a district court dismissing as moot three appeals brought by a group of trustees to orders of the Bankruptcy Court denying their claims. The district court in that case had dismissed the appeals as moot based on the conclusions that substantial consummation of the reorganization plan had occurred, outside investors had already invested $450 million in the reorganized entity, all the elements of the plan except distributions to unsecured creditors had already been completed, and a reversal of the order confirming the plan would likely put Continental, the debtor, back into bankruptcy. *Id.* at *7. The district court also noted that Continental had implemented the plan following approval of the court because the trustees had failed to obtain a stay. *Id.*

■ The Third Circuit Court of Appeals focused its attention upon the application of the mootness doctrine to the facts, because the need to reach the merits of the appeals would be obviated if the district court properly dismissed the appeals as moot. One type of mootness is what is referred to as "constitutional mootness," which implicates the case or controversy requirement of Article III, section 2. *Id.* at *4; *see also Preiser v. Newkirk,* 422 U.S. 395, 401–02, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975). An appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it "impossible for the court to grant 'any effectual relief whatever.'" *Id.* (quoting *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992)) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). If the

---

6. Appellants do not challenge the fact of numerous transactions taken in reliance on the confirmed Reorganization Plan which have been sworn to by BBHC's Vice President, Treasurer and Chief Financial Officer, *see* D.I. 8 and 21, but rather, challenge the application of the legal doctrine of mootness to these facts. As such, the Court will take as true the representations made by BBHC with respect to the transactions entered into after confirmation.

court can fashion "some form of meaningful relief," the appeal is not moot simply because a court cannot restore the parties to the *status quo ante.* *Id.* (quoting *RTC v. Swedeland Dev. Group, Inc.,* 16 F.3d 552, 560 (3d Cir.1994) (in banc)) (quoting *Church of Scientology,* 506 U.S. at 12, 113 S.Ct. at 450).

 A second type of mootness, the type implicated in the case *sub judice,* is what is referred to as "equitable mootness." *Continental Airlines, supra,* at *5. While this doctrine has been widely recognized by several circuits, *see Manges v. Seattle–First Nat'l Bank (In re Manges),* 29 F.3d 1034, 1038–39 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995); *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1048 (7th Cir.1993); *First Union Real Estate Equity & Mortgage Invs. v. Club Assocs. (In re Club Assocs.),* 956 F.2d 1065, 1069 (11th Cir.1992); *In re AOV Indus.,* 792 F.2d 1140, 1147 (D.C.Cir.1986), the viability of the doctrine had not been established in the Third Circuit Court of Appeals before *Continental Airlines.* Equitable mootness is a jurisprudential doctrine which holds that "an appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co.,* 988 F.2d 322, 325 (2d Cir.1993). As Judge Easterbrook, writing for the Seventh Circuit, observed in describing the doctrine, equitable mootness does not involve a court's *inability* to alter the outcome by fashioning relief, but rather, a court's *unwillingness* to do so. *In re UNR Indus.,* 20 F.3d 766, 769 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994).

 After reviewing the conclusions of other courts which have considered the issue, the *Continental Airlines* panel adopted the equitable mootness doctrine into Third Circuit jurisprudence, noting that "if limited in scope and cautiously applied, this doctrine provides a vehicle whereby the court can prevent substantial harm to numerous parties." *Id.* at *5. The *Continental Airlines* panel, by reference to other circuits, set forth the factors which should be considered by courts in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal:

(1) whether the reorganization plan has been substantially consummated;

(2) whether a stay has been obtained;

(3) whether the relief requested would affect the rights of parties not before the court;

(4) whether the relief requested would affect the success of the plan; and

(5) the public policy of affording finality to bankruptcy judgments.

*Id.* at *6. The court noted that the "foremost" consideration was the first factor, whether the reorganization plan has been "substantially consummated," a factor of particular "compelling" importance in cases where the reorganization plan involves complex transactions. *Id.*

As defined in the Bankruptcy Code, "substantial consummation" is:

(A) the transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). The relevance of substantial consummation to the exercise of equitable power by a reviewing court cannot be overstated. As the Fifth Circuit Court of Appeals noted in *In re Manges,* 29 F.3d at 1041, "[t]his court, in addressing the mootness issue, has borrowed the 'substantial consummation' yardstick because it informs our judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal."

 The second factor, whether a stay has been obtained, is also critical to the analysis. Reaching the issue of whether the appeal was properly dismissed as moot, the

Third Circuit appellate court observed that granting relief to claims arising from substantially consummated reorganization plans has repercussions upon the reorganization scheme as a whole, impacts which must be considered by the courts. *Continental Airlines, supra,* at *7–8. This consideration flows from the recognition of the fact that when a bankruptcy reorganization plan has not been stayed, investors and other parties make decisions and structure transactions in reliance upon the plan, changing the status quo for all interested parties; it flows *in spite of* the fact that some type of effective relief might nonetheless be available for the claimants.

Inasmuch as Continental agrees that the issue is not constitutional mootness but prudential mootness, we may assume that even after substantial or total consummation of its reorganization, some effective relief would have been and still is available for the Trustees' claim. It is quite another matter in light of the substantial, indeed irrevocable, change in the status quo to determine that it would have been equitable for the court to reach the merits of the Trustees' claim. For the district court had before it an *unstayed* bankruptcy reorganization plan, and many courts have based their prudential decisions to decline to consider challenges to bankruptcy court orders on the ground that there has been substantial consummation of a plan or reorganization in reliance upon an unstayed confirmation order.

*Id.* at *7 (citations omitted) (emphasis in original). However, whether the stay was not sought, or was sought and denied, is irrelevant to this inquiry. As one court observed, "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization." *In re UNR Indus.,* 20 F.3d at 770, *quoted in Continental Airlines, supra,* at *8.

Another factor to which the appellate court devoted extensive discussion is whether third parties have relied upon a consummated reorganization, especially when the parties are non-adverse third parties not before the court. *Continental Airlines, supra,* at *9. The trustees in *Continental Airlines* had

requested a conditional stay of the confirmation order, which was denied, after which denial outside investors moved forward with a capital infusion into the reorganized entity in the amount of $450 million. *Id.* at *10. In response to the trustees' argument that the investors consummated the transaction with the knowledge of, and thus at the risk of, the appeal of the denial of the stay, the appellate court stated:

The record shows, however, that all parties were well aware of the extensive legal precedent dismissing as moot appeals from unstayed consummated reorganizations. In light of the long line of cases that recognize the prudential considerations that militate against upsetting expectations that formed an integral part of a complex reorganization, we decline to hold that the Investors were unreasonable in proceeding with their investment in reliance on the confirmation order. By the time the district court ruled, it was no longer possible to restore the parties to their earlier positions because the investment had been made, and the option to withdraw ... was no longer available to the Investors.

*Id.* at *10 (citations omitted).

Application of these principles to the present case leads to the result that the BBHC's Motion to Dismiss the Adversary Appeal must be granted under the equitable mootness doctrine. The first of the five factors set forth by the Third Circuit Court of Appeals requires inquiry into whether the reorganization plan has been substantially consummated. The Bankruptcy Code's definition of "substantial consummation" clearly supports a conclusion that the reorganization plan was substantially consummated. *See* 11 U.S.C. § 1102(2). A transfer of all or substantially all of the property proposed by the plan to be transferred has already occurred, *id.* § 1102(2)(A), and distribution under the plan has already commenced, *id.* § 1102(2)(C). A perusal of the intricate and complex transactions which have taken place in reliance upon the confirmation of the Reorganization Plan compels this conclusion. In support of its contentions, BBHC has

filed two affidavits [7] of Ms. Jill Killam ("Killam"), Vice President, Treasurer, and Chief Financial Officer for BBHC. *See* D.I. 8 and 21. In the affidavits, Killam set forth a summary of the transactions occurring in reliance upon and after the certification of substantial consummation of the Plan.

On May 10, 1995, BBHC and Comerica exchanged all pertinent loan documents as set forth in the Plan, and Comerica extended a new $4.5 million secured line of credit to BBHC to provide working capital and to fund the Plan implementation provisions. D.I. 8 at ¶ 6. Comerica wired approximately $650,000 into BBHC's account pursuant to the loan documents. ¶ 7. BBHC paid Comerica a sum in excess of $1.8 million against the secured claim of Comerica. ¶ 8. Comerica then released 552,748 shares of the Class B Stock to the possession of BBHC, held in trust for the benefit of the Crow Creditors, and then released its lien. ¶ 9, 10. Comerica granted a second lien in favor of the Crow Creditors in 1,840,525 shares of the Class A Stock. ¶ 11. BBHC disbursed checks to creditors in the sum of $493,590. ¶ 12.

On May 11, 1995, the 552,748 shares of Class B Stock were delivered to the Crow Creditors. BBHC received a release of the lien from the Crow Creditors of their approximately $15 million judgment claim in exchange for the $5 million worth of shares of Class B Stock and BBHC's secured note for $6.5 million. ¶ 13. The Class B Stock was free and clear of any liens and the Crow Creditors were free to dispose of the shares as they wished. ¶ 16. BBHC also released claims against the Holnam Parties, other BBHC creditors, as defined in the Plan. ¶ 14. Simultaneously with these transactions, motions and orders of dismissal with prejudice executed by counsel for the Crow Creditors were delivered to BBHC for submission to the appropriate courts to dismiss all pending litigation between the parties. ¶ 15. On November 10, 1995, BBHC disbursed to unsecured creditors a 25% payment for each of their allowed claims pursuant to the Plan. D.I. 21 at ¶ 6. Transactions such as these have legal effect when consummated, effects which are irrevocable and irreversible. As such, they in part cannot be undone (e.g. payments to unsecured creditors) and otherwise cannot be unwound without producing profoundly adverse effects on the reorganization as a whole.

The second factor, whether a stay has been obtained, also militates in favor of dismissal on the grounds of mootness. Appellants filed two Motions for Stay to stay the BBHC reorganization proceedings to await determination of Adversary Appeal and the Proof of Claim Appeal. Both Motions for Stay were denied by the Bankruptcy Court and the District Court, and implementation of the Reorganization Plan continued. Here, like in *Continental Airlines,* the fact that the reorganization proceeded in reliance upon an unstayed reorganization plan is significant.

 Third, the Court must examine whether the relief requested would affect the rights of parties not before the court. Here, there are at least three identified BBHC creditors, Comerica, the Crow Creditors, and the Holnam Parties, whose rights have been affected by the implementation of the Reorganization Plan. The Crow Creditors irreparably altered their positions in reliance on the Reorganization Plan by dismissing pending litigation against BBHC with prejudice. Stock was transferred to the Crow Creditors and liens thereon were released, leaving the Crow Creditors free to dispose of the stock as they wished. In a similar fashion, Comerica has altered its position in reliance on the Plan by releasing liens and extending a new line of credit, and would be irreversibly harmed if relief were granted to Appellants.[8]

---

7. All citations to affidavits in this section refer to the first affidavit filed by Killam, dated May 31, 1995; *see* Civil Action No. 95–341 (MMS), D.I. 8, unless otherwise specifically noted.

8. Comerica, a BBHC creditor who is not a party before the Court, has filed an amicus curiae brief in support of the Motion to Dismiss the Adversary Appeal. D.I. 12. The amicus filing suggests that Comerica has its interests represented on the matters presently before the Court. However, the presence of counsel does not lead to the conclusion that as to this factor, the equitable mootness doctrine should *not* cause the dismissal of the appeal. All of the *Continental Airlines* factors are aimed at preventing the reversal of a confirmed reorganization plan once the reorganization has occurred, in recognition of the fact that at some point, the interests of creditors and

Third, the Holnam Parties gave and received releases of claims relating to BBHC. All these creditors were free to continue in the conduct of their respective businesses in reliance on the assets they received under the Plan. With respect to these creditors, who are not before the Court in these proceedings, the relief sought by Appellants would substantially affect their rights.

Fourth, and closely related to the third factor, the Court must examine whether the relief requested would affect the success of the Plan. As in all bankruptcy proceedings, substantial time and effort was devoted to creating a distribution of the BBHC assets to satisfy competing claims of creditors. To reverse the steps taken in reliance on the Plan and unwind the multimillion dollar asset transfers at a point in time nearly one year after the Plan was consummated would have a disastrous effect on the success of the Plan: it would essentially render the distribution null and void. For these reasons, the disastrous effect on the success of the Plan as a whole that would be caused by granting relief supports a finding of mootness.

Finally, the Court must consider the public policy interest in affording finality to bankruptcy judgments. *See In re Roberts Farms, Inc.,* 652 F.2d 793, 397 (9th Cir.1981) ("Certainly, reversal of the order confirming the plan of arrangement, which would knock the props out from under the authorization for every transaction which has taken place, would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court."). In light of the chaos which would ensue from a reversal of the Reorganization Plan, and the strong public policy in proceeding with the implementation of the reorganization plan of a debtor in the federal bankruptcy laws, this appeal must be dismissed as moot. *Cf. Rochman v. Northeast Utilities Serv. Group,* 963 F.2d 469, 474–75 (1st Cir.) ("Appellate reversal of an order confirming a substantially consummated re-

organization plan constructed within the framework of so many 'intricate and involved transactions[ ] ... *solely* [founded on] the order confirming the plan ... would present a daunting assignment for the Humpty Dumpty repairman.") (citations omitted) (emphasis in original), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992).

In light of these transactions taken in reliance upon the confirmed Reorganization Plan, a Plan for which stay was sought and denied, the Court concludes that BBHC's Motion to Dismiss the Adversary Appeal on the grounds of mootness will be granted. Because the Court will dismiss the Adversary Appeal, it need not reach the merits of the appeal.

### B. The Appeal of Denial of Proof of Claim [9]

Appellants filed a Proof of Claim on November 14, 1994, which asserted a claim against BBHC predicated upon the alleged fraudulent transfer of stock from the Estate of Cloyce K. Box. Attached to and referred to by the Proof of Claim was Appellants' Adversary Complaint. However, on February 6, 1995, the Bankruptcy Court dismissed with prejudice the Adversary Complaint pursuant to Bankruptcy Rule 7012(b)(6). On February 8, 1995, BBHC filed an Omnibus Objection to Certain Proofs of Claim, which included an Objection to the Proof of Claim submitted by Appellants. BBHC argued that the Proof of Claim should be dismissed on the grounds that (1) the only basis for the claim was the attached Adversary Complaint, which had been dismissed by the Bankruptcy Court, and thus Appellants had no "claim" within the meaning of 11 U.S.C. § 101(5); and (2) the only probable basis for the Proof of Claim was the allegation of a fraudulent transfer, an allegation which the Bankruptcy Court had already rejected in considering Appellants' Motion for Appointment of a

---

the reorganized entity itself become paramount to the interests of granting relief to a single creditor who has been excluded from the reorganization. Therefore, the fact that simply because one creditor has participated in the proceedings does mean that the goals behind the *Continental Airlines* test should be disregarded.

9. All citations to Docket Items and the Appellate record in this section refer to Civil Action No. 95–267 (MMS).

Trustee.[10] On March 9, 1995, the Bankruptcy Court granted the Omnibus Objection to Certain Proofs of Claim, stating:

> IT IS ORDERED that the Debtor has no liability to the Simplot Group [11]; and

> IT IS FURTHER ORDERED that the Claim of the Simplot Group is disallowed in its entirety.

App. at Exh. Q. The Bankruptcy Court did not make any findings with respect to its decision. The Proof of Claim Appeal followed.

 Under Bankruptcy Rule 8013, a district court reviewing an appeal of a bankruptcy court's findings of fact shall not set aside such findings unless clearly erroneous. Fed.R.Bankr.P. 8013; *see also In re Morrissey*, 717 F.2d 100, 104 (3d Cir.1983); *In re Visiting Nurse Ass'n of W. Pa.*, 143 B.R. 633, 637 (W.D.Pa.1992) (citing *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988)), *aff'd*, 986 F.2d 1410 (3d Cir.1993). Legal conclusions of a bankruptcy court, however, are subject to plenary review and are considered *de novo* by the reviewing court. *Brown*, 851 F.2d at 84. Because this appeal involves only questions of law (i.e. no disputed issues of fact), this Court will apply *de novo* review.

 Appellants present the following four issues as determinative to the outcome: whether the Bankruptcy Court committed reversible error in (1) giving res judicata effect to the Bankruptcy Court's Order dated February 6, 1995, dismissing the Adversary Complaint; (2) disallowing the unsecured claim asserted by Appellants on the basis that the Adversary Complaint, attached to the Proof of Claim, had been dismissed with prejudice; (3) failing to distinguish between Appellants' right to seek to set aside a fraudulent transfer and assert title to personal property claimed by the bankruptcy estate

under the Texas Uniform Fraudulent Transfer Act, Tex.Bus. and Comm.Code Ann. § 24.001 *et seq.*, and Appellants' right to assert a "claim" as defined in 11 U.S.C. § 101(5); and (4) failing to allow Appellants' unsecured claim based on the substance of a hearing held before the Bankruptcy Court on March 7, 1995.[12] BBHC argues that (1) Appellants' Proof of Claim was deficient in that it failed to provide a narrative of the existence, nature and amount of the claim; (2) Appellants' failure to amend the Proof of Claim forfeits their right to do so; (3) the Bankruptcy Court already determined that there was no fraudulent conveyance at the hearing on Trustee Motion and thus collateral estoppel bars the allegation; (4) Appellants are not entitled to damages because they cannot prove fraudulent transfer; and (5) bankruptcy policy does not support Appellants' position.

The Bankruptcy Code defines "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The Proof of Claim cannot survive without Appellants' succeeding on the Adversary Complaint. The Adversary Complaint was dismissed by the Bankruptcy Court, and as discussed above, BBHC's Motion to Dismiss the Adversary Appeal will be granted. This Court has concluded that under the equitable mootness doctrine described by the Third Circuit Court of Appeals in *Continental Airlines, supra*, irrespective of whether Appellants would be entitled to relief under any other circumstances, no relief can be granted consistent with that analysis. As such, Appellant's Proof of Claim, predicated upon the Adversary Complaint which was dismissed with prejudice, cannot survive. The Bankruptcy

---

**10.** On November 28, 1994, Appellants filed a Motion for Appointment of Trustee (the "Trustee Motion"), seeking the appointment of a trustee for BBHC based on the alleged fraudulent transfer. After a three day trial on the Motion, the Bankruptcy Court found that there was no basis for the appointment of a trustee on the alleged fraudulent transfer. The Bankruptcy Court denied the Motion by Order dated January 24, 1995.

**11.** The Bankruptcy Court referred to Appellants as the "Simplot Group."

**12.** On March 7, 1995, a hearing was held on the approval of the First Amended Disclosure Statement and the Disallowance of Appellants' Claim. 95–341 App. at Exh. 22.

Court's denial of Appellant's Proof of Claim will be affirmed.

## C. *Confirmation Appeal Motion to Dismiss Confirmation Appeal* [13]

BBHC filed its original Plan of Reorganization in October, 1994. The Plan was amended in March, 1995, and the Bankruptcy Court scheduled a hearing on the confirmation of the BBHC's First Amended Plan of Reorganization to occur on April 13, 1995. On April 7, 1995, Appellants filed an Objection to Confirmation of the First Amended Plan of Reorganization. BBHC filed a Motion to Strike Appellants' Objection on the grounds that Appellants lacked standing to participate in the confirmation proceeding. The Bankruptcy Court determined that Appellants lacked standing, and granted BBHC's Motion to Strike Appellants' Objection by Order dated April 13, 1995. The Bankruptcy Court then confirmed the First Amended Plan of Reorganization on that same date. On April 24, 1995, Appellants filed a Notice of Appeal of the Confirmation Order, which is currently before the Court. BBHC has filed a Motion to Dismiss the Confirmation Appeal, also before the Court. Because the Confirmation Appeal and the Motion to Dismiss the Confirmation Appeal concern the same issues, they will be treated together.

In support of the Confirmation Appeal, Appellants argue that Reorganization Plan fails to comply with 11 U.S.C. §§ 1129(a)(1), (a)(2), (a)(3), (a)(5), (a)(7), (a)(8) and (a)(11), and therefore the Confirmation Order is reversible. Appellants further argue that the Bankruptcy Court's Order extending Debtor's Exclusive Period should be reversed, that Debtor's Disclosure statement was inadequate, and that Appellants are entitled to a claim in the Bankruptcy proceeding. *See* D.I. 9. BBHC responds to these claims by asserting that Appellants lack standing to object to the Reorganization Plan, that BBHC complied with all disputed sections of 11 U.S.C. § 1129, and that the allegations regarding the Order extending the exclusive period and allegedly deficient disclosure statement are meritless.

The gravamen of BBHC's Motion to Dismiss the Confirmation Appeal is the mootness doctrine. *See* D.I. 7. Like the Adversary Appeal discussed *supra*, BBHC argues that the Confirmation Appeal should be dismissed because many complex and intricate transactions have occurred in reliance upon the confirmed Reorganization Plan. BBHC also argues that Appellants lack standing to pursue the appeal because, *inter alia*, they failed to appeal the Order granting the Motion to Strike the Objection to the Plan, and that Appellants failed to comply with Bankruptcy Rule 8006 in that they did not file their designation of items and statement of issues within ten days of filing the notice of appeal. Appellants respond to these arguments by urging that the appeal is not moot, that Appellants have standing to appeal the Confirmation Order, that Appellants did not have to appeal the Order granting BBHC's Motion to Strike the Objection to the Plan, and that the failure to follow Bankruptcy Rule 8006 does not warrant dismissal of the appeal.

■ The Court is confronted with the same concerns which were discussed in Part III(A), *supra*, regarding the ability of the Court to award meaningful and equitable relief to the parties. Resolution of these issues, therefore, turns on whether the Court should exercise its equitable power and dismiss the appeal on the grounds of equitable mootness. Again, the Court is guided by the criteria set forth in *Continental Airlines, supra*, and application of those principles leads the Court to dismiss the Confirmation Appeal as moot.

Without restating the series of transactions which have occurred in reliance upon the confirmed Reorganization Plan, the Court notes that at this late stage, it would be inequitable to award the relief requested. The five factors to be considered, as delineated in *Continental Airlines*, favor dismissal on the grounds of mootness. First, the Reorganization Plan has been substantially con-

---

**13.** All citations to Docket Items and the Appellate record in this section refer to Civil Action No. 95–341 (MMS).

summated, whether as defined by the Bankruptcy Code or as a matter of fact. Second, a stay was not obtained in the course of proceedings. Third, as discussed above, the relief requested would affect the rights of third parties who are not before the Court. Fourth, the relief requested would not only affect the success of the Plan, but would render all transactions which have occurred in reliance thereon a nullity. Finally, the public policy in affording finality to bankruptcy proceedings clearly supports dismissal on the grounds of mootness, since BBHC has now discharged its obligations to its creditors under the Reorganization Plan. Accordingly, the appeal must be dismissed as moot. The Court will therefore not address the merits of the Confirmation Appeal.

## IV. Summary

■■■ This Court has denied all relief to Appellants based upon the "equitable mootness" doctrine imported into Third Circuit appellate court jurisprudence by *Continental Airlines, supra*. From the vantage point of the disappointed creditor, there is nothing equitable about the equitable mootness doctrine. Invocation of the doctrine precludes merits review even if the bankruptcy court resolution was erroneous. This result occurs when the occurrence of facts and events in the commercial world cause a court to be unable to grant meaningful relief. The matter is moot out of necessity, not application of equitable principles. In a very real sense the doctrine is more accurately denominated "prudential mootness."

■■■ Labels aside, the issue for the district court is whether it is prudent to set aside a reorganization plan which has been substantially consummated before meaningful appellate review is obtained. Because the result is a denial of merits review, and the concomitant increase in the bankruptcy court's power, *see Continental Airlines, supra*, at *14 (Alito, J., dissenting), the district court must proceed with extreme caution, *see id.* at *5. While caution must be exercised, the very nature of bankruptcy generally, and of Chapter 11 confirmed reorganization plans particularly, dictate that neither the bankrupt nor its creditors in the fast paced business world can generally afford to wait while

appeals make their way at a relative glacial pace through the two-tiered appellate process. It may well be that the bankrupt and most of its creditors, if they had a choice, would actually *prefer* a reasonably quick decision rather than incur the expense of a delayed correct result.

■■■ When confronted with an appeal of an order confirming a consummated Chapter 11 reorganization plan, the Court must weigh its duty to correct allegedly erroneous decisions of the bankruptcy court against the need to prevent substantial harm to the bankrupt and numerous claimants by the reversal of those decisions. It is this balancing which informs the Court as to whether it is prudent and/or possible to "unscramble the eggs" of an almost fully consummated reorganization plan.

It is against this background that the Court must apply the *Continental Airlines* equitable mootness criteria. At the same time, caution must be the watchword. The facts of *Continental Airlines* present a far more difficult case than the facts of the matter *sub judice*. First and foremost, the *Continental Airlines* debtor represented to the bankruptcy court that the creditors' claim would be paid if it were allowed, thus blunting, if not completely eviscerating, any assertion of reliance upon the confirmed plan. As a result, the *Continental Airlines* parties had at least some basis to believe that the debtor might have to make some form of payment on the claim, to the detriment of either itself and/or its other investors and creditors. In the present case, however, BBHC's position has always been that Appellants had no basis for its disallowed claim, nor did it make provision for contingent payment in its plan.

The issue then becomes whether, notwithstanding the absence of a stay of confirmation, implementation of the plan should be delayed pending exhaustion of appeals. In the case of BBHC, the answer is clearly "no." If the answer were otherwise, the result will be that *no* complex plans could be consummated until appeals are exhausted, a result hardly envisioned by the drafters of the Bankruptcy Code.

**46**

Second, on a more simplistic level, at the appellate review stage in *Continental Airlines,* only the debtor would have had to provide funds if there had been a reversal, a result itself provided for in the plan. Similarly, all creditors were aware that the debtor had obligated itself to provide funds to the disappointed claimant if the claim were allowed, because of the express inclusion of that provision in the reorganization plan. In contrast, in the present case, BBHC made no such representation, and, an unknown number of creditors as distinguished from BBHC would possibly have to ante up the funds.

Finally, if the merits had been reviewed in *Continental Airlines* and there had been a reversal, it does not appear that the debtor would have had to chase other creditors to whom distribution had been made. Here, however, a reversal would necessitate "unscrambling the eggs," which would require the pursuit of many creditors who are not parties before the Court and who undoubtedly had long since used the proceeds of the distribution. In short, this case cries out for preclusion of merits review even if the divided panel in *Continental Airlines* had reversed and remanded that case.

### V. Conclusion

The Court will grant BBHC's Motion to Dismiss the Adversary Appeal and Motion to Dismiss the Confirmation Appeal on grounds of equitable mootness. The Adversary Appeal and the Confirmation Appeal will be dismissed. The Court will also affirm the Bankruptcy Court's denial of the Proof of Claim. An appropriate order will issue.