

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-2001

# Nordhoff Inv Inc v. Zenith Elec Corp

Precedential or Non-Precedential:

Docket 00-2249

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Nordhoff Inv Inc v. Zenith Elec Corp" (2001). *2001 Decisions*. Paper 136.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/136

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 21, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2249 and 00-2250

NORDHOFF INVESTMENTS, INC.

v.

ZENITH ELECTRONICS CORPORATION

JOHN D. MCLAUGHLIN, JR., Esq.,
          Trustee
       (D.C. No. 99-cv-00921)

OFFICIAL COMMITTEE/EQUITY SECURITY HOLDERS

v.

ZENITH ELECTRONICS CORPORATION

PATRICIA A. STAIANO,
          Trustee
       (D.C. No. 00-cv-00031)

NORDHOFF INVESTMENTS, INC.

v.

ZENITH ELECTRONICS CORPORATION

PATRICIA A. STAINO,
          Trustee
       (D.C. No. 00-cv-00032)
       Official Committee/Equity
       Security Holders,
       Appellant at No. 00-2249

       Nordhoff Investments, Inc.,
       Appellant at No. 00-2250

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Nos. 99-cv-00921, 00-cv-00031 and 00-cv-00032)
District Judge: The Honorable Gregory M. Sleet

Argued January 23, 2001

BEFORE: NYGAARD, ALITO, and FUENTES,
Circuit Judges.

(Filed: June 21, 2001)

Arnold S. Albert, Esq. (Argued)
Albert & Schulwolf
1201 Connecticut Avenue, N.W.
Suite 850
Washington, DC 20036

Thomas G. Macauley, Esq.
Zuckerman, Spaeder, Goldstein,
 Taylor & Kolker
1201 Orange Street
Suite 650, P.O. Box 1028
Wilmington, DE 19899
 Counsel for Nordhoff Investments,
Inc., Appellant at No. 00-2250

Thomas D. Schneider, Esq.
Suite 616
1515 Market Street
Philadelphia, PA 19102
 Counsel for Official Committee of
Equity Security Holders, Appellant
at No. 00-2249

2

James H.M. Sprayregen, Esq.
Ilana S. Rubel, Esq.
David J. Zott, Esq. (Argued)
Kirkland & Ellis
200 East Randolph Drive
Suite 6500
Chicago, IL 60601

Laura D. Jones, Esq.
Pachulski, Stang, Ziehl,
 Young & Jones
919 North Market Street
P.O. Box 8705, 16th Floor
Wilmington, DE 19899

Eric S. Kurtzman, Esq.
Pachulski, Stang, Ziehl,
 Young & Jones
10100 Santa Monica Boulevard
Suite 1100 Los Angeles, CA 90067
Counsel for Appellee
Zenith Electronics Corporation

OPINION OF THE COURT

NYGAARD, Circuit Judge:

This case presents the consolidated challenges by Nordhoff Investments and the Official Committee of Equity Holders to the District Court's order appr oving the Bankruptcy Court's order confirming Zenith's bankruptcy and restructuring plan. Zenith argues, as it did below, that the challenges posed to its restructuring plan are "equitably moot" because the plan has already been substantially consummated, has been relied upon by various parties, and would be very difficult to retract. The District Court thoroughly reviewed all of the relevant considerations and found the challenges equitably moot. We accept the lower court's findings of fact "unless they ar e completely devoid of a credible evidentiary basis or bear no rational relationship to the supporting data," Moody v. Security Pacific Bus. Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992).

3

Furthermore, "[b]ecause the mootness determination we review here involves a discretionary balancing of equitable and prudential factors rather than the limits of the federal court's authority under Article III, using or dinary review principles we review that decision generally for abuse of discretion." In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996) (en banc); see also In r e PWS Holding, 228 F.3d 224, 235–36 (3d Cir 2000). We find no such abuse of discretion and therefore will affir m.

I. Background

Zenith has suffered critical losses over the past twelve years. LG Electronics invested $360 million in Zenith during that difficult period, increasing its holdings from five percent to fifty-eight percent and occupying six of the eleven seats on Zenith's Board of Directors by 1997. Zenith attempted to find an outside investor willing to purchase its business, but no buyers came forward after Zenith's CEO personally met with executives from Micr osoft, Intel, General Instruments, and other leaders in the electr onics industry.

Zenith continued to suffer losses and LGE pr oposed a major restructuring of Zenith's debt and equity in April of 1998. A special committee of Zenith's Board of Directors negotiated with LGE and agreed to a plan. After forming their own advisory committee and obtaining counsel from legal and financial advisors, the bondholders also agreed to the plan. The plan included: 1) exchanging appr oximately $103 million in bonds bearing interest at 6.25 percent for $50 million in new bonds bearing interest at 8.19 percent; 2) canceling Zenith's stock for no consideration; 3) issuing new Zenith stock to LGE in exchange for $200 million of debt relief forgiving debt owed to LGE; 4) LGE extending a new $60 million credit facility to Zenith; 5) canceling approximately $175 million in additional debt owed to LGE in exchange for $135 million of new debt and ownership of the Zenith television plant in Reynosa, Mexico; 6) refinancing of debt owed to a consortium of banks led by Citicorp; 7) no alteration of debt owed to trade cr editors; and 8) releasing LGE, Zenith directors and officers, and the

Bondholder's Committee from potential liability to Zenith or certain creditors.

Zenith submitted the plan to the Securities and Exchange Commission. The SEC reviewed the plan for twelve months and eventually declared it ef fective. Despite the reduced face value of their claim, the bondholders overwhelmingly voted in favor of the plan. LGE and secured lenders, including Citibank, also approved the plan. Zenith met often with the Equity Committee during this time and provided the Committee with all of the infor mation that it requested. Zenith then filed a Chapter 11 bankruptcy petition and sought final court approval.

The plan was submitted to a Bankruptcy Court in the District of Delaware. Nordhoff, a significant minority shareholder in Zenith, and the Equity Committee, which represented the interests of the other minority shareholders, both opposed the plan and wer e represented by counsel at the two-day proceedings. Over Nor dhoff and the Equity Committee's objections, the Bankruptcy Court approved Zenith's request for an expedited hearing. The primary point of contention concerned competing valuations of Zenith. Peter J. Solomon, Co. valued Zenith at $300 million. That valuation was corroborated by the fact that Zenith had been unable to sell at a related price, the bondholders' agreement to reduce their claims, and other relevant valuations. Ernst and Young, appearing on behalf of the Equity Committee, valued Zenith at $1.05 billion, which was based on a discount rate the "same as Microsoft's" and a higher royalty rate than calculated by Solomon. Nordhoff and the Equity Committee attempted to discredit Solomon by presenting evidence that Solomon had a conflict of interest based upon its pr evious relations with Zenith and would receive a $1 million awar d if Zenith's plan was successful.

The Bankruptcy Court ultimately accepted Solomon's valuation over Ernst and Young's and decided that: 1) "Zenith's Plan [was] proposed in good faith under the general requirements of the bankruptcy code"; 2) the plan was entirely fair; 3) LGE had acted appr opriately; 4) Zenith's disclosure statement contained a wealth of information, the plan was approved by SEC, and it

5

complied with nonbankruptcy law and the Bankruptcy Code; 5) the "shareholders are r eceiving the value of their interests under the plan--nothing"; 6) Solomon's valuation was not tainted; and 7) this "reorganization is exactly what chapter 11 of the Bankruptcy Code was designed to accomplish."

The Bankruptcy Court conditionally confirmed the plan and rejected Nordhoff and the Equity Committee's objections on November 2, 1999. The Bankruptcy Court permitted the release of all claims by Zenith, but refused to allow the release of claims by creditors who did not vote in favor of the plan. The Court therefore r equired Zenith to delete any release by claimants who had not affirmatively accepted the plan. The Court granted Zenith ten days to make these modifications.

Nordhoff and the Equity Committee r eceived the Bankruptcy Court's opinion on November 3. Zenith immediately made the required changes and submitted the amended plan to the Court on November 4. Zenith served the Equity Committee with the amended plan on November 4, but, because of what they testified was an"oversight," Zenith officials did not serve Nordhof f with the amended plan at this time. The Court signed the amended confirmation order on November 5, but did not immediately notify the parties. Nonetheless, Zenith lear ned that the order had been signed via the Court's public web cite on November 5. On November 9, Zenith officials faxed a letter to Nordhoff and the Equity Committee stating that they "understand that the court signed the confir mation order on November 5." Zenith received a signed copy of the confirmation on November 10 and faxed copies of the amended plan and the Court's confirmation or der to Nordhoff and the Equity Committee the same day. Nordhoff and the Equity Committee filed notices of appeal to the Bankruptcy Court on November 12. At no point, however, did either Nordhoff or the Equity Committee seek to stay the plan.

Both the proposed and final plan called for"Immediate Effectiveness," and it was clear thr oughout the proceeding that Zenith intended to implement the plan immediately upon approval. As a result, much of the plan was executed

between November 5, when the Court confirmed, and November 10, when Nordhoff was first officially notified. The following transactions were completed by November 9: 1) Zenith replaced its debtor-in-possession credit facility with a new $150 million facility syndicated by Citicorp; 2) Zenith entered into a new $60 million cr edit facility with LGE; 3) Zenith canceled old stock and issued new stock to LGE; and 4) Zenith canceled certain debt owed to LGE, issued new debt to LGE, and canceled some of the new debt in exchange for the transfer of the Reynosa plant at a later date. Zenith's bondholders, however, did not begin to tender their $103.5 million in old bonds for $50 million in new publicly traded instruments until November 19, 1999. Nearly all of the bonds were exchanged by January 3, 2000, and they have been subject to public trading ever since. If bondholders did not own a sufficient amount of debt to receive a new bond, their holdings were aggregated and sold on the open market. The cash proceeds wer e then allocated to the fractional holders. Zenith management has since been replaced by LGE management, and the Zenith executives who devised the plan have departed.

Nordhoff and the Equity Committee appealed to the District Court, challenging the valuation of their shares, the reliance on Solomon's valuation, the expedition of the proceedings, the lack of evidentiary recor d, and the plan provisions releasing LGE and Zenith's dir ectors from potential liability. The District Court dismissed the appeal as equitably moot.

## II. Discussion

At least one Bankruptcy Court has characterized "equitable mootness" as a misnomer: "Ther e is nothing equitable about the equitable mootness doctrine. . .. The matter is moot out of necessity, not application of equitable principles. In a very real sense the doctrine is more accurately denominated as `prudential mootness.' " In re Box Brother Holding Corp., 194 B.R. 32, 45 (Bankr. D. Del. 1996); see also PWS Holding, 228 F.3d at 235-36 (stating that "the use of the word `mootness' as a shortcut for a court's decision that the fait accompli of a plan confirmation should preclude further judicial proceedings

7

has led to the unfortunate confusion between equitable mootness and constitutional mootness"). W e do not entirely agree. One inequity, in particular, that is often at issue is the effect upon innocent third parties. When transactions following court orders are unraveled, thir d parties not before us who purchased securities in r eliance on those orders will likely suffer adverse ef fects.

We developed the equitable mootness doctrine in In re Continental Airlines, 91 F.3d 553 (3d Cir . 1996) (en banc). Continental Airlines involved a complex Chapter 11 reorganization premised upon a $450 million investment by two outside parties. Trustees of creditors challenged the plan due to the decline in value of the aircraft and jet engines securing their investment. This challenge jeopardized the plan because the investors had conditioned their involvement upon the absence of such liability. The Bankruptcy Court rejected the trustees' claim. The trustees sought a stay, were denied, and appealed to the District Court. Meanwhile, relying on the Bankruptcy Court's confirmation, the investors committed their capital and consummated the plan. Continental then moved to dismiss the trustees' appeal on grounds of equitable mootness. The District Court granted the motion and dismissed the appeal. We affirmed, stating that such "an appeal should . . . be dismissed as moot when, even though ef fective relief could conceivably be fashioned, implementation of that relief would be inequitable." Continental Airlines, 91 F.3d at 559 (citing In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993)).

We held that five factors had to be considered when conducting an equitable mootness analysis:

> (1) whether the reorganization plan has been substantially consummated,
>
> (2) whether a stay has been obtained,
>
> (3) whether the relief requested would af fect the rights of the parties not before the court,
>
> (4) whether the relief requested would af fect the success of the plan, and

8

(5) the public policy of affording finality to bankruptcy judgments.

Id. at 560. As we stated in PWS Holding , these "factors are given varying weight, depending on the particular circumstances, but the foremost consideration is whether the reorganization plan has been substantially consummated." 228 F.3d at 236. In ef fect, the equitable mootness doctrine prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract. We have noted, however, that the "doctrine is limited in scope and should be cautiously applied . . . ." PWS Holding, 228 F .3d at 236.

We now consider the elements of the equitable mootness doctrine against these facts.

A. Substantial Consummation of the Plan

As we stated in Continental Airlines, the substantial consummation factor is the "foremost consideration" in an equitable mootness analysis, especially when the plan "involves intricate transactions . . . or wher e investors have relied on the confirmations of the plan." 91 F.3d at 560. The Bankruptcy Code defines "substantial consummation" to mean:

> (A) transfer of all or substantially all of the pr operty proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the pr operty dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. S 1101(2).

Appellants concede that the plan has been substantially consummated. The Confirmation Order stated that the plan would be immediately effective, and many of the key transactions were completed by November 9, 1999. On November 19, Zenith began exchanging bonds in accordance with the plan, and by January 2000, the only

9

portion of the plan remaining to be consummated was the exchange of one percent of the bonds. By that time, all property had been transferred, all managerial changes had occurred, and virtually all of the distributions had been made. As the District Court concluded, there can be little question that the plan has been substantially consummated.

Appellants claim, however, that the plan was "remarkable" for how little it actually accomplished and that it could be easily retracted. Since it did not contain intricate transactions, Appellants claim, the plan could be reversed in a manner equitable to all parties. Appellants argue that although the plan involved debt and asset evaluation of large sums, mere quantities do not rise to the level of complexity found in Continental Airlines. Further, Appellants claim that Zenith could have conducted the plan under state law and without the approval of the Bankruptcy Court. The only reason Zenith utilized bankruptcy law, Appellants argue, was to eliminate minority shareholders' rights and expedite the process. Because the plan was simple and could be so easily reversed, Appellants argue that it is appropriate for us to reconsider the valuation question befor e the Bankruptcy Court. If the Bankruptcy Court's valuation findings were reversed, then a new trial could be conducted to determine if LGE paid a fair price.

The District Court found Appellant's arguments "not completely without merit." Compared to the plan in Continental Airlines, which entailed numer ous irrevocable transactions, the merging of fifty-thr ee debtors, the investment of $110 million in cash by two outside investors, and the transfer of trade routes by foreign governments, the plan here is relatively simple. The District Court recognized that the assembly plant could be transferred back to Zenith, the exchange of debt for stock could be reversed, and that since Citicorp had been the major debtor to Zenith before, during, and after the transaction its refinancing could be r eversed without great difficulty. The District Court found the exchange of bonds, however, to present "a more difficult problem." Since the bonds are publicly traded, the District Court speculated

10

that "they may have been sold, perhaps mor e than once," and it would therefore be difficult, if not impossible, to reverse the exchange. Further, "any such reversal would almost certainly impact the rights of investors that were not involved in the bankruptcy court proceedings." While potentially difficult, the District Court nonetheless reasoned that "the reversal of these transactions would not likely be quite as daunting a task as the unmerging of 54 debtors and the return of the outside investors' investments" as would have been required in Continental Airlines. The District Court concluded that

> although some of the Plan transactions could conceivably be "reversed," this would not be easy to accomplish, and other transactions may not be reversible at all. This factor, ther efore, weighs heavily in favor of dismissal, at least to the extent that the court could not fashion relief that would not r esult in the dismantling of the plan.

We have no reason to find that the District Court abused its discretion in making this determination. The Court considered each of Appellants' arguments and prudentially balanced the concerns. Although the plan her e is not as complex as the plan in Continental Airlines, it is hardly simple. The plan required eighteen months of negotiation between several parties regarding hundr eds of millions of dollars, restructured the debt, assets, and management of a major corporation, and successfully rejuvenated Zenith. Appellants have not offered any evidence that the plan could be reversed without great difficulty and inequity, and we have reason to believe that the bond r edistribution is unretractable. See In re UNR, 20 F.3d 766 (7th Cir. 1994); In re Public Serv. Co. of New Hampshir e, 963 F.2d 469 (1st Cir. 1992). The District Court, therefor e, did not abuse its discretion in its analysis of this factor of the equitable mootness test.

B. The Failure to Obtain a Stay

Because of the nature of bankruptcy confir mations, we have held that it "is obligatory upon appellant .. . to pursue with diligence all available remedies to obtain a stay

11

of execution of the objectionable order (even to the extent of applying to the Circuit Justice for relief. . . ), if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." In re Highway Truck Drivers & Helpers Local Union #107, 888 F .2d 293, 297 (3d Cir. 1989); see also Continental Airlines , 91 F.3d at 566 ("There was a clear possibility the [Appellants'] claims would become moot after consummation of the plan, and it was therefore incumbent on the [Appellants] to obtain a stay."); In re Chateaugay Corp., 988 F.2d at 326 ("[T]he party who appeals without seeking to avail himself of that [stay] protection does so at his own risk."); In re Crystal Oil Co., 854 F.2d 79, 82 (5th Cir. 1988) (finding a claim inequitable because the Appellant made no ef fort to obtain a stay); In re Roberts Farms, Inc. , 652 F.2d 793, 798 (9th Cir. 1981) (dismissing an appeal for lack of equity because the Appellant never applied to the bankruptcy court for a stay); In re Grand Union Co. v. Saul, Ewing, Remick & Saul, 200 B.R. 101, 105 (Bankr. D. Del 1996). Appellants did not, at any time, seek a stay. As the District Court determined, this weighs heavily in favor of dismissing Appellants' claims.

Appellants argue that because Zenith did not provide a copy of the revised plan on November 4, and since much of the plan was consummated by the time they received notice on November 9, it was futile for them to seek a stay in an attempt to prevent the plan from being substantially consummated. The record does reflect that Zenith learned on November 5 that the revised plan had been confirmed but did not directly relay this infor mation until November 9, at which time much of the plan had been consummated. Zenith surely realized that the minority shareholders, whose shares were nullified without consideration, would oppose the confirmation order. The District Court, therefore, correctly characterized this "oversight" as "suspicious."

As the District Court correctly reasoned, however, this oversight did not foreclose Appellants fr om seeking a stay. First, although Zenith did not immediately pr ovide notice to Nordhoff, it did provide immediate notice to the Equity Committee. Nordhoff was, at all times, a member of the

12

Equity Committee, and therefore Appellants had an opportunity to bring a timely request for a stay before the plan was consummated. Second, Appellants wer e well aware that the plan was about to be confir med. All relevant versions of the plan called for "Immediate Ef fectiveness," and the Bankruptcy Court conditioned its confir mation upon only minor modifications. Confirmation was pending, the Equity Committee was immediately notified when the modified plan was approved, and the confir mation was publically posted on November 5 on the Bankruptcy Court's web site. If Appellants intended to seek a stay, these circumstances afforded them the opportunity to do so immediately upon the approval of the plan. Thir d, and most importantly, both sets of Appellants were, by all accounts, notified by November 9. The bond exchanging, the most complex and irreversible element of the plan, did not begin until November 19. Appellants have not offer ed any justification for not seeking a stay between November 9 and November 19. "Therefore," the District Court concluded, "while the circumstances surrounding the appellant's failure to obtain or even seek a stay suggests that this factor should receive somewhat less weight than it ordinarily would, it does still weigh in favor of a finding of equitable mootness."

The District Court properly weighed the competing considerations and therefore its deter mination that the failure to obtain a stay weighed in favor of dismissing Appellants' claims was within its discretion.

C. Reliance on Confirmation by Parties not Before the Court

In addition to the first two elements of the doctrine of equitable mootness, we stated in Continental Airlines that "[h]igh on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on thefinality of the transaction." 91 F.3d at 562. As we further explained, the "concept of mootness from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance

13

on the plan as implemented." Id. (citing Manges v. Seattle–First Nat'l Bank, 29 F.3d 1034, 1039 (5th Cir. 1994)).

The District Court considered the status of six parties who Zenith alleged would have their interests undermined by reversal of the confirmation or der: 1) the consortium of lenders headed by Citicorp; 2) Zenith's bondholders; 3) Zenith's retailers and distributors; 4) Zenith's vendors, suppliers, and service providers; 5) LGE; and 6) Zenith's former minority shareholders. The District Court found that "none [of these parties] appear to merit the same `outside investor' status as the investors in Continental ," who committed $450 million. To varying degr ees, however, the District Court found that some of these parties merit protection.

First, because Citicorp was a secured lender before, during, and after the confirmation, it would not suffer an adverse impact as a result of appellate r eview. Also, the lenders voted in favor of the plan and were r epresented by counsel at the proceedings below. Thus, the District Court found that Citicorp's $40 million advance on a $150 million credit facility at least raised questions as to whether they should be viewed as "third parties not befor e the court." Second, the District Court found that the inter ests of the bondholders were "perhaps mor e strongly implicated." Although the bondholders were not true outside parties "in the sense that they could walk away from the deal," the "bonds are publicly traded and the bondholders today may not be the same investors as the bondholders at the time of the bankruptcy filing or confirmation." Therefore, the District Court reasoned:

> Many sales of those bonds may have occurred in the reliance on the creditworthiness of the r eorganized debtor. Whether these reliance inter ests will be impaired depends upon the impact of appellate r eview on that creditworthiness. It would seem that the bondholders would likely be harmed only if r eversal of the confirmation order leads to the withdrawal of LGE's support . . .

We agree that the bondholders maintain a third party interest. Third, the District Court found Zenith's claims

14

regarding the retailers, distributors, and suppliers "somewhat thin." Apparently, these parties entered into commitments with Zenith in reliance on thefinality of the reorganization and allocated shelf space, production capacity, and credit according to the confirmation, and the District Court found that "[a]t least some of these unnamed entities are likely to be `third parties' entitled to consideration under the equitable mootness analysis." The Court found the "potential harm to these parties, however," to be "somewhat speculative." Fourth, the District Court found Zenith's attempt to characterize LGE as an outside party "unpersuasive" since it was the majority shareholder prior to bankruptcy and is now the sole shareholder. Unlike the outside investors in Continental Airlines , LGE would have incurred massive losses had it walked away from the deal. Fifth, the Court found Zenith's claims that the minority shareholders may have taken tax deductions based on their losses without merit since Zenith did not produce any evidence that these former shareholders would prefer to take the tax deduction instead of recovering their previous stock holding.

The District Court concluded that there "are third parties who have likely relied on confirmation of the plan and who could be harmed by reversal of the confirmation order." "Although these parties may not be properly characterized as `outside investors,' " the Court stated,"such investors are not the only types of third parties given considerations in an equitable mootness analysis." "Therefore," the Court concluded, "while this factor may not warrant quite as much weight as it did in Continental, it does still weigh in favor of a finding of equitable mootness."

Nordhoff also challenges the District Court on this issue by claiming that all of the third parties, with the exception of the retailers and suppliers, were before the Bankruptcy Court and therefore are not, as Continental Airlines required, "non-adverse third parties who are not before the reviewing court." As Zenith points out, however, the requirement calls for parties to be before the reviewing court, and while some of these parties may have been for the Bankruptcy Court, they are not before us now. See In Re Box Brothers, 194 B.R. at 42. Since these parties are not

15

currently before us and relied on the plan confirmation, they merit protection under the equitable mootness doctrine.

Although these facts do not present the same extent of reliance as found in Continental Airlines , this concern still weighs against Appellants' challenges. The District Court did not abuse its discretion in its deter mination that "non-adverse third parties who are not befor e the reviewing court" relied on the confirmation and therefore merit some protection.

D. Whether the Relief Requested Would Af fect the Success of the Plan

We also consider whether Appellants' concer ns could be remedied without unraveling the entirety of the plan or whether they seek to "knock the props out fr om under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." In re Chateaugay Corp., 10 F.3d at 952; see also In Re Robert Farms, 652 F.2d 793, 798 (9th Cir. 1981).

Appellants challenge the valuation of Zenith, and this price is the very centerpiece of the plan. As the District Court noted, the agreed-upon valuation per mitted: 1) LGE's emergence as the sole shareholder with no consideration paid to the minority shareholders, and 2) the bondholders' acceptance of new bonds worth roughly one half the value of the old bonds. The plan would no longer be viable without these agreements, and the futur e relationship between LGE and Zenith would be cast in doubt. W ithout LGE, Zenith would likely be forced to liquidate under Chapter 7 since their recent recovery is contingent upon the plan. Thus, Appellants do not challenge an "intermediate" element of the plan that could be altered while maintaining the overall integrity of the plan, as in PWS Holding Corp., 228 F.3d 224.

Appellants explicitly indicated during oral ar gument that it was their intention to dissolve the plan: "This is one of [those plans] where the plan can and should be unravel'ed. Okay? I do want to make that clear. Again, if it was vague

16

from my papers, let me make it absolutely clear ." Appellants seek "nothing less than a wholesale annihilation of the Plan," In re Manges, 29 F .3d at 1043, and this proposed relief would affect the r e-emergence of the debtor as a revitalized entity." See In r e Club Assocs., 956 F.2d 1065, 1069 (11th Cir. 1992). The District Court thus properly found that this element of the equitable mootness doctrine weighs against Appellants.

E. General Public Policy Affording Finality
to Bankruptcy Judgments

As the District Court stated, "the public policy of affording finality to bankruptcy judgments is better described as the lens through which the other equitable mootness factors should be viewed." We described this rationale in Continental Airlines:

> Our inquiry should not be about the "reasonableness" of the Investors' reliance or the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage r eliance of investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtor's estates and facilitating successful reorganization, reflected in the code itself, clearly weighs in favor of encouraging such r eliance. Indeed, the importance of allowing approved reorganizations to go forward in r eliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine. Where, as here, investors and other third parties consummate a massive reorganization in reliance on an unstayed confirmation or der that, explicitly and as a condition of feasibility, denied the claim for which appellate review is sought, the allowance of such appellate review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganization like this more difficult.

91 F.3d 565 (citations omitted).

17

Here, unlike Continental Airlines, LGE is not an outsider but rather had independent financial incentive to facilitate Zenith's recovery. It is therefore less necessary to encourage LGE's reliance on the bankruptcy judgment in this case. However, this plan did enable Zenith to negotiate with several parties and recover from its decline. Likewise, a number of parties relied on the confir mation of the plan, and, as the District Court stated, reversal would be contrary to the public policy of encouraging actions, by outsiders and investors alike, that facilitates successful reorganizations.

The District Court, therefore, did not abuse its discretion by determining that the public policy of pr omoting the finality of bankruptcy judgements also weighed in favor of dismissing Appellants' appeals.

F. Other Considerations

1. Expedition of the Confirmation

Appellants further argue that expediting the plan's confirmation was unfair since the Appellants had only one month to prepare objections, and this was an insufficient amount of time. In addition, Appellants complain that the plan was consummated between November 4 and November 9, which was before Nordhoff knew of the confirmation. Despite this final push toward consummation, however, all parties were aware of the plan during its eighteen–month creation and were allowed to review r elevant documents and meet with the plan operatives. "Thus," as the District Court stated, "despite expedited proceedings in the Bankruptcy Court, Appellants cannot claim to have been denied a meaningful opportunity to engage their own experts or otherwise oppose the plan." We agree.

2. Solomon's Valuation

Appellants also complain that the Bankruptcy Court adopted Solomon's valuation despite conflicts of interest. First, courts have broad discretion not only to admit expert witnesses, but also to weigh their testimony. Kumho Tire

Co., Ltd. v. Carmichael, 526 U.S. 137, 153 (1999). Second, Solomon's valuation was corroborated by the fact that no investors had accepted Zenith's offer to sell at a related price, the bondholders' agreement to reduce the value of their claims, and other relevant valuations. Third, the margin of error between Solomon's valuation and Zenith's solvency was $400 million. Fourth, the Bankruptcy Court determined that Solomon's compensation was not a mere "success fee," but rather was for a "substantial array of services: investment banking advice, financial analysis, operational restructuring, marketing, as well as valuation analysis. The `success fee' was not offer ed for its testimony at the confirmation hearing." We will not disturb these findings.

## III. Conclusion

The District Court gave serious consideration to the issues of fundamental fairness that Zenith may have abused. "Because the issues implicate the fair ness of the process by which the plan was proposed and confirmed," the District Court stated, "the court is somewhat reluctant to preclude appellate review of those issues." "Although the court will dismiss the appeals," it decided, "it does not do so without some hesitation." The District Court concluded: "Having considered and weighed the factors discussed above, the court is convinced that dismissal of these appeals on equitable mootness grounds is appr opriate. In particular, Appellants' failure to even seek a stay as the plan was being substantially – if not entir ely – consummated outweighs the courts concerns identified above."

The District Court accurately analyzed each of the factors of the equitable mootness test, appropriately balanced these elements, and concluded that the doctrine should apply to Appellants' claims. The District Court ther efore did not abuse its discretion and we will affir m.

19

ALITO, Circuit Judge, concurring in the judgment:

I reluctantly concur in the judgment of the court. Under In re Continental Airlines, 91 F .3d 553 (3d Cir. 1996) (en banc), cert. denied sub nom. Bank of N.Y . v. Continental Airlines, 519 U.S. 1057 (1997), I am afraid that we must affirm the decision of the District Court holding that the appeal is equitably moot. The District Court applied the standard adopted in Continental Airlines , and although the District Court's decision is debatable, it did not commit an abuse of discretion.

In reaching this conclusion, I am primarily influenced by the appellants' failure to seek a stay. It is disturbing that Zenith, in a seeming attempt to moot any appeal prior to filing, succeeded in implementing most of the plan before the appellants even received notice that the plan had been confirmed. However, the plan was not entirely consummated when the appellants finally lear ned of the bankruptcy court's order. Most notably, the exchange of the old for the new bonds had still not been carried out. If the appellants had promptly applied for a stay, with or without posting a bond, when they finally got word of what the bankruptcy court had done, I would view this appeal differently. But the appellants never applied for a stay and have not provided an adequate explanation for their failure to do so. Under these circumstances, I cannot say that the decision of the district court was an abuse of discr etion.

For the reasons explained in my dissent in Continental Airlines, see 91 F.3d at 567–73, however, I continue to disagree with the expansive version of the equitable mootness doctrine that our court adopted in that case, as well as with the abuse–of–discretion standar d of review. See id. at 568 n.4 (Alito, J., dissenting). As this case shows, our court's equitable mootness doctrine can easily be used as a weapon to prevent any appellate review of bankruptcy court orders confirming reorganization plans. It thus places far too much power in the hands of bankruptcy judges.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

20