### In the Matter of: UNR INDUSTRIES, INC., et al., Debtors.

### Appeals of Unarco Bloomington Factory Workers.

### Nos. 93–1510 and 93–2268.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1993.

Decided April 5, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied May 27, 1994.*

---

7. We agree with the district court's disposition of this claim.

* Rovner, Circuit Judge, did not participate in the consideration or decision of this case.

James G. Walker, Bloomington, IL, Pamela S. Hollis (argued), Donald E. Johnson, Kimberly M. Centella, Hollis & Johnson, Chicago, IL, for Unarco Bloomington Factory Workers.

Janet S. Baer, Neal L. Wolf, Winston & Strawn, Chicago, IL, for Official Committee of Unsecured Creditors and Class 4 Disbursing Agent.

Joel R. Nathan, Asst. U.S. Atty., Chicago, IL, Neal L. Wolf, Winston & Strawn, Louis W. Levit, Robert L. Baker, Ross & Hardies, Richard G. Smolev, Sachnoff & Weaver, Robert B. Chatz, Arvey, Hodes, Costello & Burman, Kevin M. Forde, J. William Cuncannan, Defrees & Fiske, Matthew J. Botica, Hopkins & Sutter, James C. Murray, Jr., Katten, Muchin & Zavis, John F. White, McKenna, Storer, Rowe, White & Farrug, Clifford Meacham, Dept. of Justice, United States Trustee, Richard M. Bendix, Jr., Bret A. Rappaport, Asst. Atty. Gen., Malcolm M. Gaynor (argued), Paul J. Gaynor, Schwartz, Cooper, Kolb & Gaynor, James P. Hemmer, Kimberly K. Sawyer, Bell, Boyd & Lloyd, Chicago, IL, Gene Locks, Grietzer & Locks, Philadelphia, PA, James B. Burns, Office of U.S. Atty., Chicago, IL, George A. Davidson (argued), Hughes, Hubbard & Reed, New York City, David F. Heroy, Neal, Gerber & Eisenberg, Chicago, IL, for UNR Industries, Inc.

Bret A. Rappaport, Asst. Atty. Gen., Paul J. Gaynor, Schwartz, Cooper, Kolb & Gaynor, Chicago, IL, for UNR Inc., Unarco Industries, Inc., UNR–Rohn, Inc. (Alabama), Jobal Tube Co., Inc., Folding Carrier Corp., UNR–Rohn, Inc. (Indiana).

Before COFFEY and EASTERBROOK, Circuit Judges, and CURTIN, District Judge.**

EASTERBROOK, Circuit Judge.

Twelve years ago, claims based on exposure to asbestos UNR Industries had manufactured or sold were rolling in, with no end

** Hon. John T. Curtin, of the Western District of New York, sitting by designation.

in sight and a correspondingly slim chance of satisfying all current and future claims. UNR commenced a reorganization in bankruptcy, the first asbestos manufacturer to do so. After some preliminary maneuvering recounted at 725 F.2d 1111 (1984), and 736 F.2d 1136 (1984), the firm and its creditors agreed on a plan of reorganization. The reorganized firm ("New UNR") endowed an Asbestos Disease Trust, which received approximately 63% of the firm's stock to supply additional income. Other creditors received the bulk of the remaining stock in lieu of cash payment. Shareholders retained only 8% of the stock. Claims relating to asbestos—whether the disease was manifest or latent at the time of the reorganization—must be presented to the Trust. After confirmation of the plan, New UNR emerged from the reorganization as a healthy business, free from enervating litigation. It has raised new capital, which would not have been possible without liberating its future endeavors from claims attributable to past wrongs. Some, albeit incomplete, compensation for asbestosis, mesothelioma, and related diseases is assured. UNR blazed a trail that other producers, such as Manville and Robins, followed. When approving an award of attorneys' fees to the debtors' attorneys, we characterized the outcome as a "notable success". 986 F.2d 207, 208 (1993).

Not everyone agrees. One group of creditors declined to approve the plan and has carried on a rear guard action since its confirmation. Although the plan of reorganization ensures full payment of all workers' compensation awards, employees of UNR's plant in Bloomington, Illinois, believe that they are entitled to more. Their additional claims have been grouped with those of UNR's customers. Accordingly, the employees must apply to the Trust for payment of any claim in excess of workers' compensation. Requests for reclassification have gotten the employees nowhere—although the district court has not foreclosed all possibility of relief. See 165 B.R. 198 (N.D.Ill.) (postponing final decision until after the disposition of this appeal). What is at stake on this appeal is nothing less than the vitality of the plan of reorganization itself. The employees took a timely appeal from the bankruptcy court's order confirming the plan. Both the district court and this court denied motions to stay implementation of the plan. The employees' request for reclassification of their claims delayed the resolution in the district court of their objections to the plan itself. (So did orders holding James Walker, their lead counsel, in contempt of court for defying the injunction that directs the employees to present their claims to the Trust rather than to the reorganized UNR and related entities.) Eventually, however, the district court dismissed as moot all challenges to the confirmation of the plan. See 124 B.R. 268 (N.D.Ill.1990), 143 B.R. 506 (N.D.Ill.1992), 1993 WL 181453, 1993 U.S.Dist. LEXIS 5111, 7219 (N.D.Ill.). The long delay between the bankruptcy court's confirmation of the plan and the district court's disposition of objections to that action laid the foundation for the conclusion that the plan is beyond challenge.

UNR urges us to join the district court in sweeping all pieces off the board. Three years after the confirmation of the plan of reorganization is simply too late to upset the applecart, it insists, making legal debate futile. (The plan was confirmed on June 1, 1989, and was implemented on March 2, 1990.) To the extent UNR and the district court believe that the case is moot in the sense that relief is *impossible*, so that there is no longer a case or controversy within the scope of Article III, they overstate matters. Even when it is no longer possible to restore the parties to the positions they used to occupy, the case remains live while "a court can fashion *some* form of meaningful relief". *Church of Scientology v. United States,* —— U.S. ——, ——, 113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992) (emphasis in original). We could give the employees much of what they want by holding that persons whose disease was not manifest by the date the plan was confirmed may not obtain compensation from the Trust; the employees then would have fewer competitors for the limited assets. Whether we *should* do any such thing is a different matter. The raw ability to do it means that the case is not moot.

Far stronger is the contention that reliance on the plan of reorganization makes it imprudent to revise things. Since the plan went into effect, more than 15 million shares of New UNR have been distributed to its creditors and pre-petition shareholders and are trading on public exchanges. Warrants for additional stock have been issued and are trading. (The Trust has received still more shares, but these have not been sold to outside investors.) Corporate acquisitions and divestitures (not to mention ordinary commercial transactions) have occurred; tax consequences (including a $90 million income tax benefit) have been realized; large insurance settlements have been disbursed; lawsuits have been dismissed. Undoing all of this is impossible. Undoing *part* of it—the identification of persons entitled to make claims on the assets in the Trust—is possible but has ramifications for the rest of the plan. Reducing the claims to be made on the Trust would imply a reallocation of some stock to UNR's other creditors. If persons for whom the consequences of exposure to asbestos was not manifest as of 1990 cannot make claims against the Trust, can they press them against New UNR? If the answer is yes, then the allocation of insurance proceeds must be changed—and there will be a sudden revaluation of the shares of New UNR, which current holders purchased on the assumption that all asbestos payments would be borne by the Trust.

In common with other courts of appeals, we have recognized that a plan of reorganization, once implemented, should be disturbed only for compelling reasons. E.g., *In re Chateaugay Corp.*, 10 F.3d 944, 952–54 (2d Cir.1993); *In re Specialty Equipment Cos.*, 3 F.3d 1043, 1047–49 (7th Cir.1993); *In re Andreuccetti*, 975 F.2d 413, 418 (7th Cir. 1992); *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir.1981); *Miami Center Limited Partnership v. Bank of New York*, 838 F.2d 1547, 1554–55 (11th Cir.1988); *In re AOV Industries, Inc.*, 792 F.2d 1140, 1147–50 (D.C.Cir.1986). Several provisions of the Bankruptcy Code of 1978 provide that courts should keep their hands off consummated transactions. For example, 11 U.S.C. § 363(m) says that the reversal of an order authorizing the sale or lease of property of

an estate "does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal". Unless the sale is stayed pending appeal, the transaction survives even if it should not have been authorized in the first place. See *In re Sax*, 796 F.2d 994 (7th Cir.1986); cf. *In re Edwards*, 962 F.2d 641 (7th Cir.1992) (concluding that § 363(m) does not, however, forbid all forms of collateral attack). Another section of the Code, 11 U.S.C. § 1127(b), dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and "substantial consummation". Section 1127(b), unlike § 363(m), does not place any limit on the power of the court of appeals, but the reasons underlying §§ 363(m) and 1127(b)—preserving interests bought and paid for in reliance on judicial decisions, and avoiding the pains that attend any effort to unscramble an egg—are so plain and so compelling that courts fill the interstices of the Code with the same approach. Sometimes the doctrine goes under the banner "equitable mootness," but the name is misleading. There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ("equitable mootness"). Using one word for two different concepts breeds confusion. Accordingly, we banish "equitable mootness" from the (local) lexicon. We ask not whether this case is moot, "equitably" or otherwise, but whether it is prudent to upset the plan of reorganization at this late date.

Our opinion in *Specialty Equipment* observes that failure to seek a stay pending appeal counsels against upsetting a plan of reorganization. 3 F.3d at 1047. UNR's employees sought a stay at every opportunity; by doing so, they insist, they preserved their entitlement to full appellate review. Perhaps so, if failure to seek a stay were a censurable event to be punished by refusal to adjudicate the merits. Yet requesting a stay is not a mandatory step comparable to filing a timely notice of appeal. The significance of an application for a stay lies in the opportunity it affords to hold things in stasis, to prevent

reliance on the plan of reorganization while the appeal proceeds. A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization. And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal. Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self-protection through the adjustment of prices may affect the viability of the reorganization, and in any event may distort the allocation of assets away from the persons who can make the most valuable uses of them and toward persons who are less sensitive to the costs of *ex post* changes of plans. By protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize *ex ante*, and thus produces benefits for creditors in the aggregate. Many common law doctrines, such as the rule that a holder in due course takes free of certain defects in its predecessor's rights, reflect the importance of this effect. We do likewise in preserving plans of reorganization unless a powerful reason demands alteration.

Have the employees demonstrated such a reason? They say that treating as "creditors" persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution. The constitutional claim is mysterious. Injuries attributable to past acts are certain to occur; although the identity of the victims remains to be ascertained, the existence of the injury is real enough. Insurers would charge a pretty penny to underwrite a policy covering these injuries; they would not assume that probabilities equate to nonexistence. Cases such as *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), hold that persons at risk of injury may sue to block the source of the danger, even if no one has yet been injured and the risk to any particular plaintiff is slight. Application of this principle to voluntary credi-

tors such as employees is clear enough. A firm that promised medical care, or retirement or death benefits, to its employees may be required to purchase an annuity to fund the promises, even though the beneficiaries cannot be known with precision at the time of the reorganization. Similarly, a dispute about the enforceability of a policy of insurance is justiciable even though no casualty has occurred. See also *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). At all events, the structure of the plan does not depend on particular claims filed by potential victims; it was negotiated and approved by the undisputed, current creditors. The disposition of UNR's assets surely posed a case or controversy for the bankruptcy court to adjudicate. The plan of reorganization provides that future claims will be satisfied out of one pile of assets (the Trust) rather than another (New UNR); apportioning claims among assets is a traditional function of bankruptcy adjudication. Principles of tort law, and of corporate reorganizations, do the same, without protest on constitutional grounds. See *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 (7th Cir.1993) (discussing the circumstances under which buyers of assets are liable for their predecessors' torts).

As for the contention that the statute does not contemplate such a step: 11 U.S.C. § 101(5)(A) defines as a "claim" every "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured". The definition is capacious, to say the least. Attaching labels such as "contingent" and "unmatured" and "disputed" to the interests of persons who will become sick in the future because of exposure to UNR's asbestos therefore does not put those interests beyond the power of the bankruptcy court. The employees' observation that the plans reorganizing Manville and Robins provided for payment of a higher percentage of current (and future) damages is altogether irrelevant to the definition of a "claim" under the Code and the propriety of the plan of reorganization.

Bankruptcy separates the past and future of an enterprise, satisfying claims attributable to yesterday's activities out of existing assets and thereby enabling business operations that have positive value to carry on, unburdened by the sunk costs of blunders that are beyond recall. *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562 (7th Cir.1986); *In re Iowa R.R.,* 840 F.2d 535 (7th Cir.1988); *Stamp v. Insurance Co. of North America,* 908 F.2d 1375 (7th Cir.1990). By letting bygones be bygone, from the firm's perspective, while assuring some compensation to those who learn in the future that these bygones caused them injury, a plan of reorganization like the one adopted here promotes both productivity and compensation. Failing to satisfy, out of assets available at the time of the petition, the claims of persons whose injury becomes manifest after the filing of the petition, would simultaneously provide (other) creditors with excessively large shares of the estate, and create a drag on ongoing operations that could cause the dissolution of business ventures with positive cash flow (and thus potentially substantial social and private value). See Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 47–54 (1986); Mark J. Roe, *Bankruptcy and Mass Tort,* 84 Colum.L.Rev. 846 (1984). Cf. Douglas G. Baird, *The Elements of Bankruptcy* 90–91 (rev. ed. 1993). We observed in an earlier appeal, 725 F.2d at 1118–19, that making provision for future claimants would pose formidable logistical problems, but these have been overcome. We were concerned that the effort might be "a quixotic undertaking far beyond the realistic boundaries of judicial competence". *Id.* at 1120. Things have turned out better than we feared in 1984. By 1992 we could declare the outcome a "notable success". 986 F.2d at 208. So there is no absolute bar to the approach adopted in UNR's plan of reorganization. Whether one or another detail (for example, the allocation of insurance proceeds and the release of additional claims against insurers) could have been accomplished better is precisely the sort of question that should not upset a substantially consummated plan of reorganization. We do not express any view on the merits of the employees' challenge to these details, or even inquire whether these particular creditors are entitled to challenge them; three years after confirmation of the plan, it is enough that they *are* details. Thus although we do not share the district court's view that the case is moot, we approve its conclusion that the plan should not be disturbed.

AFFIRMED.