29 F.3d 301
 25 Bankr.Ct.Dec. 1447
 In the Matter of ENVIRODYNE INDUSTRIES, INCORPORATED,
Debtor-Appellee.
Appeal of UNOFFICIAL COMMITTEE OF 13 1/2% NOTEHOLDERS OF
ENVIRODYNE INDUSTRIES, INCORPORATED.
 No. 93-4070.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 20, 1994.
Decided July 12, 1994.
 
 Allan Sweig, Chicago, IL, Steven E. Greenbaum (argued), Stephen B. Selbst, Andrew Dash, Berlack, Israels & Liberman, New York City for appellant.
 James E. Spiotto, Stephen L. Garcia, Chapman & Cutler, Chicago, IL, Edwin G. Schallert, Steven R. Gross, Debevoise & Plimpton, New York City, for intervenor-appellee.
 Howard M. Hoffmann, David I. Herbst, Gregg E. Szilagyi, Michael A. Reiter, Allan S. Brilliant (argued), Holleb & Coff, Chicago, IL, Stephen M. Schuster, Envirodyne Industries, Incorporated, Oak Brook, IL, for debtor-appellee.
 Before POSNER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This appeal arises out of an objection by creditors to a plan of reorganization filed by Envirodyne Industries, Inc., a Chapter 11 debtor. Envirodyne had three levels ("tranches," as they are called) of unsecured debt. One, the most senior, consisted of Senior Discount Notes. The plan called for the holders of these notes to receive notes of equivalent value in the reorganized firm. The next level consisted of 14% Senior Subordinated Debentures, and was junior to the Senior Discount Notes. The third level consisted of 13.5% Subordinated Notes and was junior to both the 14% notes (as we shall call them) and the Senior Discount Notes. The 13.5% notes had actually been issued before the Senior Discount Notes and the 14% notes (both issued in 1989 as part of a leveraged buyout of the company), but had been made subordinate to them by the indenture pursuant to which the 13.5% notes were issued. That indenture provided that in the event of a default, "all Superior Indebtedness" (defined to include the 14% notes, though issued later as we have said, together with the Senior Discount Notes) "shall first be paid in full before the Noteholders, or the Trustee, shall be entitled to retain any assets (other than shares of stock of the Company, as reorganized or readjusted or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinated, at least to the same extent as the Notes, to the payment of all Superior Indebtedness which may at the time be outstanding)."
 
 
 2
 The plan of reorganization called for the distribution to the 14% noteholders of common stock worth $121 million in the reorganized firm in partial payment of their notes, the face amount of which was $200 million. The 13.5% noteholders, although owed $100 million, received only $20 million worth of stock, on the theory that by virtue of the subordination provision we quoted they were entitled to nothing until the holders of the Senior Discount Notes and the 14% notes received stock or other securities sufficient in value to satisfy their claims in full. The 13.5% noteholders objected to being subordinated in this fashion. They argued that the words "other than shares of stock in the Company" entitled them to be treated the same as the 14% noteholders if the distribution to creditors took the form of stock rather than new notes, as it has done. The bankruptcy judge rejected the objection and confirmed the plan. The 13.5% noteholders appealed to the district court, which affirmed the bankruptcy judge. They tried but failed to get a stay from the district court and from this court pending their appeal. The plan of reorganization was then implemented, and the first question is whether it is now too late to provide the appellants with any feasible relief, in which event we must dismiss the appeal without reaching its merits.
 
 
 3
 A case is moot if there is no possible relief which the court could order that would benefit the party seeking it. Church of Scientology v. United States, --- U.S. ----, ----, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992). The appeal in this case is not moot in that sense. At least partial relief is possible, and that is enough to satisfy the requirements of Article III. Id. at ----, 113 S.Ct. at 450; In re UNR Industries, Inc., 20 F.3d 766, 768 (7th Cir.1994). Maybe total relief is possible, though that of course is not essential to jurisdiction (relatively few plaintiffs get all they are seeking in their lawsuit). We could order the bankruptcy judge to modify the plan of reorganization to reallocate $20 million worth of the stock that the 14% noteholders received to the appellants, the 13.5% noteholders. Some of the 14% noteholders, it is true, have already sold their stock, but they could be ordered to surrender some or all of the proceeds to the appellants.
 
 
 4
 But even when relief is possible in a case such as this through modification of a plan of reorganization, courts will frequently refuse to modify the plan if it has already been implemented, because of the effects of modification on nonparties to the dispute. Id. at 769-70, and cases cited there. This principle went by the misleading name of "equitable mootness," until the name was anathematized by Judge Easterbrook in the UNR case. Id. at 769. The now nameless doctrine is perhaps best described as merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 375, 97 S.Ct. 1843, 1874-75, 52 L.Ed.2d 396 (1977); Okaw Drainage District v. National Distillers & Chemical Corp., 882 F.2d 1241, 1248 (7th Cir.1989). So if modification of a plan of reorganization would upset legitimate expectations, it may be refused; but we cannot tell whether that is the case here. The 14% noteholders, arguing against the modification, claim that if they had known that they would not be getting all the common stock necessary to satisfy their claim in full, they would not have consented to the plan of reorganization, but would instead have attempted to force Envirodyne into liquidation. The appellants reply somewhat implausibly that this is nonsense, that the 14% noteholders would have received nothing in liquidation, so much less valuable would Envirodyne have been if sold on the auction bloc rather than continued under its present management. But the purchaser at the auction could hire back the present management; for the issue would not be whether to sell Envirodyne's assets piecemeal but whether the company was worth more sold to new owners or owned by the company's creditors.
 
 
 5
 The record before us is not adequate to enable us to decide whether modification of the plan of reorganization would bear unduly on the innocent. Therefore, if we had doubts about the merits (or rather lack thereof) of the 14% noteholders' claim, so that the issue of "equitable mootness" might be dispositive, we would have to remand the case to the bankruptcy court for a determination of that issue. But we have no doubts, and since, despite its former name, "equitable mootness" is not a jurisdictional doctrine (which is one reason the name has been discarded), we can with propriety elide the question of its applicability and come directly to the question of the indenture's meaning.
 
 
 6
 The parties agree that the parenthetical clause that is the focus of dispute is unambiguous. This use of the word "agree" may seem nonsensical, since the parties assign opposite meanings to the clause. But when opposing parties agree that the document whose meaning they dispute is not ambiguous, all they mean is that they are content to have its meaning determined without the help of any "extrinsic" evidence. What is unusual about this case is that the parties disagree about what counts as extrinsic evidence. The appellants argue that extrinsic evidence is everything except the Chicago Manual of Style, which they contend points unerringly to the interpretation that they favor. The 14% noteholders think that extrinsic evidence of the indenture's meaning would be testimony or documents concerning the intentions of the draftsmen of the indenture rather than scholarly literature on the purposes of the class of clause illustrated by the parenthetical clause in the indenture, such as the American Bar Foundation's Commentaries on Model Debenture Indenture Provisions (1971). They are surely right, though it hardly matters in this case, since the meaning of the clause is plain without regard to what the commentators have said about it.
 
 
 7
 The rule that bars the introduction of extrinsic evidence when a contractual provision is more or less clear "on its face" (e.g., Patton v. Mid-Continent Systems, Inc., 841 F.2d 742, 745 (7th Cir.1988); Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1438-39 (7th Cir.1993)) instantiates the broader principle that (with exceptions unnecessary to consider here) parol or extrinsic evidence is admissible to interpret but not to contradict or alter the written contract. 2 E. Allan Farnsworth, Farnsworth on Contracts Sec. 7.12, pp. 272-73 (1990). If the written contract is clear without extrinsic evidence, then such evidence could have no office other than to contradict the writing, and is therefore excluded. The object in excluding such evidence is to prevent parties from trying to slip out of their clearly stated, explicitly assumed contractual obligations through self-serving testimony or documents--which, though self-serving, might impress a jury--purporting to show that the parties didn't mean what they said in the written contract. Contractual obligations would be too uncertain if such evidence were allowed. But dictionaries, treatises, articles, and other published materials created by strangers to the dispute, like evidence of trade usage, which is also admissible because it is also evidence created by strangers rather than by a party trying to slip out of a contractual bind, do not present a similar danger of manufactured doubts and are therefore entirely appropriate for use in contract cases as interpretive aids. Appropriate, and sometimes indispensable. It would be passing odd to forbid people to look up words in dictionaries, or to consult explanatory commentaries that, like trade usage, are in the nature of specialized dictionaries.
 
 
 8
 We cannot find a case actually discussing the admissibility of such materials, perhaps because it is thought obvious. Cases in which courts use them to interpret contractual or statutory provisions are legion; with reference to the ABF indenture commentaries alone, see Harris Trust & Savings Bank v. E-II Holdings, Inc., 926 F.2d 636, 644 (7th Cir.1991); Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048-50 (2d Cir.1982); Elliott Associates v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71-72 (2d Cir.1988). But the courts do not feel called upon to justify this use.
 
 
 9
 The indenture in this case provides that the holders of the superior indebtedness, which includes the 13.5% noteholders, are entitled to be paid in full before the 13.5% noteholders can receive any distribution other than (1) shares of stock in the reorganized firm, or (2) securities in the reorganized firm or any other firm created by the reorganization, payment of which is subordinated to the claims of the holders of the superior indebtedness. The appellants argue that the payment clause qualifies only (2), so if the distribution is of stock they are entitled to equal treatment with the holders of superior indebtedness. The 13.5% noteholders argue that the clause qualifies both (1) and (2). The appellants' argument is entirely grammatical and semantic. They say that the punctuation shows that the payment clause qualifies only (2) and that shares of stock, unlike dividends for example, are not "paid." We understand neither argument. It is commonplace to set off a series with commas and have a phrase at the end qualifying the entire series rather than the last entry in it. So one might say, "The man, or the woman, who is sitting on the bench." And if one doesn't "pay" stock, neither does one "pay" securities. The term "payment of" is used in the parenthetical clause as a synonym for "receipt of" or "entitlement to."
 
 
 10
 A better argument for the appellants is that if the draftsmen had wanted to subordinate all securities received by the junior creditors to the claims of the senior creditors, they easily could have said so clearly. It was not necessary to specify shares of stock and securities separately. Or they could have said "shares of stock and other securities" if they wanted to emphasize that there was no exception for stock. On balance the appellants have the better of the purely semantic argument. But their interpretation makes no sense once the context of the terminology being interpreted is restored.
 
 
 11
 The class of clause to which the parenthetical clause in this indenture belongs goes by the unilluminating name of "X Clause." American Bar Foundation, supra, at 570-71. (Perhaps "equitable mootness" should be renamed the "X Doctrine.") Such clauses are common in bond debentures, although there is no standard wording. Without the clause, the subordination agreement that it qualifies would require the junior creditors to turn over to the senior creditors any securities that they had received as a distribution in the reorganization, unless the senior creditors had been paid in full. Then, presumably, if the senior creditors obtained full payment by liquidating some of the securities that had been turned over, the remaining securities would be turned back over to the junior creditors. The X Clause shortcuts this cumbersome procedure and enhances the marketability of the securities received by the junior creditors, since their right to possess (as distinct from pocket the proceeds of) the securities is uninterrupted.
 
 
 12
 The purpose of the clause as we have explained it bears no relation to the interpretation for which the appellants contend, under which the senior creditors' priority would depend entirely on the form of the distribution. The appellants concede that if the distribution took the form of new notes rather than of stock, the junior creditors would be subordinated. But if the distribution took the form of stock, they argue, the junior creditors would be pooled with the senior creditors, destroying the latter's seniority. We cannot understand why the form in which rights in the assets of the reorganized firm are allocated among the creditors should determine the creditors' priority--and specifically why a distribution in the form of stock should erase the priority of a senior class of creditors. To make priority depend on the form of distribution in this way would, moreover, give senior creditors an incentive to press for liquidation, contrary to the purpose of Chapter 11, since then there would be no distribution of stock and hence no chance for the junior creditors to achieve parity with the seniors.
 
 
 13
 The X Clause in this case was poorly drafted, but we think its meaning is clear: any securities, including stock, that the junior creditors receive in a reorganization are subordinated to the claims of the senior creditors. The judgment of the district court is therefore
 
 
 14
 AFFIRMED.