In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-1511

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL SEGAL,

*Defendant-Appellant,*

*v.*

M. SCOTT MICHEL, as Trustee of Mr. Segal's
forfeited interests in NNNG and its
Subsidiaries and Affiliates, and FIREMAN'S
FUND INSURANCE COMPANY,

*Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 112—**Ruben Castillo**, *Judge.*

_____

ARGUED SEPTEMBER 7, 2005—DECIDED DECEMBER 29, 2005

_____

Before CUDAHY, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* After a conviction and a forfeiture verdict, Michael Segal relinquished his interest in several Chicago-area insurance companies to the United States. The court appointed a trustee to manage these interests for the government's benefit. Segal challenges the district court's

approval of the trustee's transfer of one of Segal's former businesses, International Film Guarantors, Incorporated ("IFG"), to an outside firm, Fireman's Fund Insurance Company ("Fireman's Fund"). We affirm.

**I.**

Michael Segal owned a large number of insurance-related companies based in Chicago. While Segal's businesses had numerous subsidiaries and affiliates, as relevant for our purposes, he was the one hundred-percent owner of Near North National Group, Inc. ("NNNG"), which, in turn, was the sole owner of Near North Insurance Brokerage, Inc. ("NNIB"), which held a one hundred-percent interest in North Sun, Inc. ("North Sun"). We take this whirlwind tour through a small section of the Near North corporate maze because the present appeal centers on IFG, which North Sun and Fireman's Fund[1] jointly owned, each having a fifty-percent stake. IFG provided completion guarantee bonds for the film and television industry, guaranteeing that a project would be completed on time and within budget. Basically, Fireman's Fund supplied the underwriting and insurance support for IFG, while North Sun performed backroom operations, human resources, accounting, and marketing. Importantly, Segal added value to this joint venture through his extensive relationships with people in the entertainment industry.

In 2004, a federal jury convicted Segal on a variety of charges, including a wide-ranging violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") arising

---

[1] Fireman's Fund is one of the leading suppliers of insurance products to the entertainment industry and is unrelated to Segal.

out of illegal business dealings. Two days later, the jury returned a forfeiture verdict under RICO, expressly finding that: (1) Segal should forfeit $30 million in property; (2) Segal held an interest in an enterprise that he operated and controlled in violation of RICO; and (3) 60% of Segal's interests in NNIB and NNNG were tainted and subject to forfeiture. The district court entered a preliminary order of forfeiture in July 2004, holding that Segal's entire interest in the "Near North enterprise" was forfeited to the government. The district court's ruling named twenty-three separate companies, including NNIB, NNNG, North Sun, and IFG, as part of the Near North enterprise. In addition, the district court ordered Segal to forfeit $30 million in property. Soon thereafter, the district court appointed M. Scott Michel as Trustee to manage "Segal's interests in NNNG and its subsidiaries and affiliates" on behalf of the government.

Segal objected to the district court's definition of the Near North enterprise, contending that several of the companies listed in the preliminary forfeiture order were not involved in any RICO violations. Since these companies did not participate in the racketeering activities, Segal argued that they should not have been listed in the preliminary forfeiture order, which dealt with companies directly involved in the RICO scheme. On October 6, 2004, the district court agreed that these companies were untainted by the RICO violation and issued an order modifying the preliminary forfeiture order by excluding seven companies, including North Sun and IFG.

Around this time, Fireman's Fund and the Trustee began to meet to resolve various claims and ownership interests relating to the Near North enterprise. In addition to its ownership stake in IFG, Fireman's Fund had also

extended a loan to Near North Entertainment Insurance Services in the amount of $4 million in 1997 and a loan to NNNG in the amount of $10 million in 2001. These loans were guaranteed both by NNNG and Segal himself. Further, as part of the 2001 loan agreement, North Sun pledged as security its ownership interest in IFG. At the time of Segal's conviction, the loans were in default in the amount of $6.8 million.

On December 7, 2004, Fireman's Fund submitted a confidential written settlement proposal to the Trustee. Fireman's Fund wanted to end its IFG relationship with North Sun after Segal's conviction and proposed to release its secured claims on the defaulted loans in exchange for North Sun's interest in IFG. Fireman's Fund set out an expedited time frame to obtain a court-approved settlement, first indicating that any deal had to be done by the end of the year (eventually Fireman's Fund relented and extended the deadline to the middle of January). Fireman's Fund informed the Trustee that if a settlement were not reached by the deadline, it would foreclose on the security interests and cease its underwriting support for IFG. While other companies made initial inquiries about North Sun's stake in IFG, Fireman's Fund made clear that it would not accept another company stepping into the shoes of North Sun.

Recognizing that the October 6 modification order seemingly foreclosed his authority to dispose of IFG, the Trustee alerted the district court to Fireman's Fund's settlement overtures. At an early December hearing at which Segal's counsel was present, the district court authorized the continuation of negotiations on the settlement, but did not rule on IFG's status. On December 29, the Trustee filed a motion for the court's approval of a settlement with

Fireman's Fund, and the court set a final hearing to decide IFG's fate on January 12, 2005. The proposed settlement provided that, in exchange for North Sun's fifty-percent ownership in IFG, Fireman's Fund would release the $6.8 million in secured claims that it held against Segal's Near North enterprise.[2] The Trustee noted in the motion for approval that, given Fireman's Fund's contractual rights, the only alternative to approval would be liquidation, which would take several years, incur administrative liabilities, and ultimately result in substantially less benefit than offered in the settlement. Segal made a timely objection to the Trustee's motion.

At the January 12 hearing, the district court allowed both sides to present arguments regarding the status of IFG and the proposed settlement. As a preliminary matter, Segal objected to the hearing because of the absence of his lead counsel, but the court overruled the objection because of the tight schedule imposed by Fireman's Fund and the fact that Segal was represented at the hearing by two different law firms, including a member of his lead counsel's firm. The court then proceeded to consider the status of IFG. The Trustee contended that the forfeiture of NNIB and NNNG encompassed all of their interests and assets, meaning any subsidiaries were also forfeited. Following the corporate chain, this meant that North Sun was forfeited as a wholly-owned subsidiary of NNIB and therefore North Sun's interests also belonged to the government. Segal did not object to the Trustee's description of the Near North corpo-

---

[2] While the original motion to approve the settlement references $6.2 million in claims, Fireman's Fund agreed before the January 12 hearing to release a second claim of approximately $700,000.

rate organization, and the court concluded that North Sun
and its interest in IFG were forfeited as subsidiaries of
forfeited companies.[3]

The district court next heard testimony about the gen-
eral prospects for IFG, as well as the different elements of
the settlement. On the financial side, while IFG had some
assets, those assets were not easily accessible. IFG owned
yet another company named IFG Re that had assets of
approximately $13 million. If a claim were made under one
of the IFG completion bonds, IFG Re would be respon-
sible for the first $2 million, with Fireman's Fund hav-
ing responsibility for excess amounts. Billions of dollars,
however, remained in outstanding liability under these
bonds at the time of the hearing, and two to three million
dollars had to be held in reserve during any liquidation
under the applicable insurance laws. Furthermore, wind-
ing down IFG's business as part of any liquidation would
take approximately 18 to 30 months.

Moreover, the outlook for IFG was bleak. Fireman's
Fund was ready to withdraw its support from IFG and form
a competing company with IFG's management team in the
absence of a court-approved deal. Basically, although it was
sharing premiums with North Sun, Fireman's Fund was
assuming all the risk. There was no incentive for Fireman's
Fund to continue with IFG, especially considering that Segal
was a convicted felon who no longer provided any of the

---

[3] In its minute order of January 14 memorializing this finding,
the district court stated "if we find that any of the other five
excluded 'related affiliates and subsidiaries' [from the October 6
modification of the Preliminary Forfeiture Order] . . . is also
a subsidiary of NNNG and NNIB, we will hold that it too is
forfeit under RICO's enterprise forfeiture provision."

personal networking services originally contemplated. According to IFG's president, without the support of Fireman's Fund, IFG would no longer be a going concern. Specifically, he stated: "IFG couldn't continue as a stand-alone business. It just doesn't have the financial strength or capacity to underwrite completion guaranties for motion pictures." Further, Fireman's Fund was under no contractual obligation to keep providing underwriting services to IFG, which essentially gave Fireman's Fund a veto over any prospective successor to North Sun. As stated before, while there had been some interested parties referred to Fireman's Fund, Fireman's Fund apparently did not want to continue the IFG venture with any of them.

After hearing this testimony, the district court concluded that IFG was a broken partnership and the IFG business relationship had completely changed when Segal was convicted. Noting IFG's intrinsic valuation problems given Fireman's Fund's de facto veto power and Segal's conviction, the district court decided that the settlement was reasonable. On January 14, the district court entered an order approving the Global Settlement with Fireman's Fund, and, later, it denied Segal's motion to reconsider. Segal appeals.

## II.

The parties raise a variety of jurisdictional and substantive issues. First, the Trustee contends that Segal's notice of appeal is defective because it fails to designate for appellate consideration the January 14 order that confirmed IFG was a forfeited asset. Second, Fireman's Fund and the Trustee argue that, as an equitable matter, this court should refuse to hear the appeal because the settlement

would be difficult to unwind. Third, Fireman's Fund asserts that this court does not have jurisdiction over the appeal because the collateral order doctrine, which is relied upon by Segal, does not apply. For his part, Segal argues that the district court lacked the authority to enter the January 14 order regarding IFG's status because the October 6 modification order conclusively removed IFG as a forfeited entity. Segal also challenges the sale approval hearing on due process grounds because he did not have all relevant documents and the district court denied his motion to continue. Additionally, Segal asserts that the ultimate result of the hearing was a fire sale lacking commercial reasonableness and good faith. Finally, Segal contends that the sale produced a taking in violation of the Fifth Amendment. We consider each issue in turn below.

## A. Designation of Order in Notice of Appeal

The Trustee initially claims that Segal failed to specify the January 14 order in his notice of appeal as required by Fed. R. App. P. 3(c), and, therefore, he cannot challenge IFG's status, which that order resolved. Rule 3(c) is a jurisdictional rule that provides a notice of appeal must "designate the judgment, order, or part thereof being appealed from." *Nichols v. United States*, 75 F.3d 1137, 1140 (7th Cir. 1996) (quoting Fed. R. App. 3(c)). In his notice of appeal, Segal specifically identified (and attached): (1) the order approving the IFG settlement and (2) the order denying Segal's motion to reconsider the approval. Segal, however, did not designate the January 14 order as required by the Rule 3(c).

While Segal did not reference the January 14 order, Rule 3(c) does not bar our consideration of his claims

about IFG's status as having been forfeited. The Supreme Court has instructed that this rule must be liberally construed and has framed the appropriate inquiry as whether sufficient notice was given to apprise the other parties of the issues challenged. *See id*. As long as the intent to appeal from the judgment may be inferred from the notice and the appellee has not been misled by a defect in the notice, a technical failure in the notice will not preclude us from reaching the merits. *See United States v. Dowell*, 257 F.3d 694, 698 (7th Cir. 2001); *see also Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 625 (7th Cir. 1993). While Segal did not expressly designate the minute order devoted to IFG's status, he clearly was challenging all parts of the settlement as he did at the hearing, which would include whether the Trustee had any authority to sell IFG. Neither the Trustee, Fireman's Fund, nor the government claim that they were misled by the notice of appeal into thinking this issue would not be raised. Therefore, the Trustee's Rule 3(c) argument does not eliminate our jurisdiction over this issue.

## B. Mootness

Reaching the next jurisdictional hurdle, we must determine whether this appeal is moot. Although the parties generally discuss mootness concerns, they are actually raising two independent concepts—mootness (meaning the issue has been resolved) and its equitable corollary (meaning it's too late to unwind the settlement). In its brief, Fireman's Fund states that this appeal is moot and, at first, cites to the general case law on this subject. The real thrust of both Fireman's Fund and the Trustee's arguments, however, is not actual mootness, but the related principle that the court should be reluctant to set aside

a consummated deal. Given this situation, we will address each of these issues separately.

Turning first to whether this appeal is actually moot, we look to whether it is possible to grant any meaningful relief to Segal. When making a mootness determination, we consider "not whether we may return the parties to the status quo ante, but rather, whether it is still possible to 'fashion *some* form of meaningful relief' to the appellant in the event he prevails on the merits." *See Flynn v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 13 (1993)). Segal suggests that this court could grant relief by setting aside the district court's approval of the sale and restoring North Sun's interest in IFG as well as reinstating Fireman's Fund's claims against Segal and the various Near North companies. While the advisability of such a course of action for Segal is highly questionable given Fireman's Fund's commitment to walk away from IFG if it is not the whole owner and the near certainty of IFG's collapse, that is not relevant to the mootness inquiry. Rather, we must determine whether we have the power to order some meaningful relief. We do. If we were to agree with Segal on the merits of his appeal (and we do not, as we will soon discuss), we could fashion a remedy where IFG would be returned to its prior position as a joint venture and the Trustee would again have the responsibility of determining the best deal he could get for North Sun's interest. Such relief, which might benefit Segal, is possible, so the appeal is not moot.

Having reached this conclusion, however, we still must consider whether we should decline to exercise jurisdiction because of the consummation of the settlement. Fireman's Fund and the Trustee import this principle from an equitable concept in bankruptcy: the court

should be hesitant to set aside an approved and consummated plan.[4] *See In the Matter of Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994). This doctrine stems from a concern for the stability of a plan and reliance interests of innocent third parties. *See, e.g., In the Matter of UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994); *Envirodyne*, 29 F.3d at 304. The court must conduct a fact-intensive analysis, weighing "the virtues of finality, the passage of time, whether the plan has been implemented and whether it has been substantially consummated, and whether there has been a comprehensive change in circumstances." *In the Matter of Specialty Equip. Co., Inc.*, 3 F.3d 1043, 1048 (7th Cir. 1993); *see also UNR*, 20 F.3d at 770 ("And it is the reliance interest engendered by the plan, coupled with the difficulty of reversing the critical transaction, that counsels against attempts to unwind things on appeal."); *In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004) (a court should consider whether a case "presents transactions that are so complex or difficult to unwind that the doctrine [ ] would apply."); *In the Matter of Andreucetti*, 975 F.2d 413, 418 (7th Cir. 1992).

While this equitable doctrine comes from bankruptcy principles, the same concerns about the reliability of a completed business deal and its effects on innocent third

---

[4] Although several other circuits refer to this principle as "equitable mootness," we shy away from this term because it fosters confusion. *See In the Matter of UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome (equitable mootness). Using one word for two different concepts breeds confusion. Accordingly, we banish 'equitable mootness' from the (local) lexicon.") (emphasis in original).

parties exist here. Similar to a bankruptcy case, in this forfeiture action the district court reviewed the decision of a trustee who had an obligation to maintain and dispose of assets for the maximum benefit of the owner/ creditor, though the interests he was protecting belonged to the government, not Segal. 18 U.S.C. § 1963(e). Still, it is a sufficiently comparable situation that importing useful bankruptcy principles makes sense.

As noted, the Trustee and Fireman's Fund argue that this court should not consider the merits of Segal's appeal because unwinding the deal approved by the court would be impractical at this juncture. The district court approved the sale of IFG to Fireman's Fund in exchange for release of the Fireman's Fund claims in mid-January of this year. Although Segal was not required to obtain a stay, we cannot ignore the fact that, since he did not, the deal moved ahead. *See Specialty Equip.*, 3 F.3d at 1047 ("[A] party that elects not to pursue a stay subsequent to confirmation risks that a speedy implementation of the reorganization will moot an appeal."). This deal had a number of practical implications for Fireman's Fund, IFG, and IFG's management and employees that would make it hard to unwind. Fireman's Fund hired other companies to supply the accounting, human resources, and information technology services formerly provided by North Sun. Furthermore, Fireman's Fund scrapped plans to walk away from IFG and form a competing company. If the deal were reversed, IFG would immediately be teetering on financial collapse given Fireman's Fund's desire and contractual right not to work with North Sun. Further, IFG management indicated that they would have left for different opportunities if the ownership situation had not been resolved as it was by the settlement.

These facts give us pause. However, while we are concerned about trying to unwind the settlement, it is difficult to determine the precise effects of such an action because the record provides little illumination on this subject. This prevents us from conclusively holding that the settlement was so complex or that the changes after the settlement have been so sweeping that it would be foolish for us to even consider reversing the deal. Therefore, with some reservations, we move on.

### C.   Collateral Order Doctrine

Fireman's Fund raises a final jurisdictional issue, that the present appeal does not satisfy the collateral order doctrine and, thus, we cannot consider it. As a general rule, an appellate court does not have jurisdiction over a non-final order, and this rule is strictly applied in criminal cases. *See United States v. Rinaldi*, 351 F.3d 285, 288 (7th Cir. 2003). The collateral order doctrine provides some relief, allowing a party to appeal a non-final judgment where the issues raised are "too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated." *Montano v. City of Chicago*, 375 F.3d 593, 598 (7th Cir. 2004) (quoting *United States v. Thompson*, 814 F.2d 1472, 1475 (10th Cir. 1987)). The Supreme Court has set out a three-part framework to evaluate whether an order fits within this exception: (1) the order must conclusively determine the disputed question; (2) it must dispose of an issue totally apart from the merits; and (3) it must be virtually unreviewable on appeal from a final judgment. *See, e.g., Rinaldi*, 351 F.3d at 288; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). This court explained that ' "[e]ffectively unreviewable' means something more than that hardship

will result from delay or that the course of litigation will be changed without an appeal." *See United States v. Michelle's Lounge*, 39 F.3d 684, 693 (7th Cir. 1994).

In this case, the three requirements of the collateral order doctrine are met. First, the order approving the settlement conclusively disposes of all the relevant issues, including the Trustee's implicit authority over IFG and the fairness of the settlement itself. Second, the order disposed of a matter that was completely separate from the merits of the Segal's criminal conviction. Finally, the order was effectively unreviewable on appeal from a final judgment. Litigation is still proceeding before the district court as the Trustee attempts to resolve various claims and dispose of assets. Given that IFG has already been transferred to Fireman's Fund, waiting several more months for a final judgment would likely end any reasonable opportunity that Segal has to challenge the settlement.[5] As the order satisfies the collateral order doctrine, we proceed to the merits.

## D. Court Orders on IFG's Status

Having emerged from the jurisdictional thickets, we now consider Segal's various challenges to the district court's approval of the settlement. Segal first argues that neither the district court nor the Trustee had any authority to dispose of IFG at the time of the January settlement because the district court had excluded North Sun and IFG as non-forfeited enterprises in October. We review the district court's findings of fact for clear error, and the

---

[5] Because a different analysis is involved, our conclusion that the order is sufficiently final to be appealable does not contradict our earlier comments about mootness and its equitable corollary.

question of whether those facts compel forfeiture under RICO de novo. *See United States v. Marmolejo*, 89 F.3d 1185, 1197 (5th Cir. 1996).

The forfeiture provisions under RICO state that a person shall forfeit to the government:

> (1) any interest the person has acquired or maintained in violation of section 1962;
>
> (2) any—
>
>> (A) interest in;
>>
>> (B) security of;
>>
>> (C) claim against; or
>>
>> (D) property or contractual right of any kind affording a source of influence over;
>
> any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

18 U.S.C. § 1963(a). The property subject to forfeiture includes all tangible and intangible personal property, including rights, privileges, interests, claims, and securities. 18 U.S.C. § 1963(b)(2).

In the forfeiture proceedings, there was some understandable confusion as the district court waded through the various entities that Segal had used in his RICO enterprise. At first, the district court entered a preliminary forfeiture order that designated all of Segal's insurance companies, including North Sun and IFG, as forfeited because of the RICO violations. In October of 2004, however, the district court excised North Sun, IFG, and a handful of other companies from the preliminary forfeiture order because they did not appear to be involved in the RICO scheme.

However, at the time of the October order, the district court did not know that NNNG owned NNIB,[6] which owned North Sun, which had the fifty-percent stake in IFG.[7] NNNG and NNIB were clearly forfeited as part of the RICO scheme, a fact that Segal does not challenge. It therefore follows that *all* assets of these companies, including all of their interests in other companies, were forfeited to the government. Consequently, both the wholly-owned North Sun, and North Sun's interest in IFG never were independent interests of Segal and should have followed NNNG and NNIB into the hands of the Trustee as forfeited assets of those companies. After hearing testimony about this corporate structure at the forfeiture hearing, the district court acknowledged in its January 14 order that North Sun and IFG were forfeited as assets of NNNG and NNIB and modified the October order to reflect that.

The question then becomes whether the district court could properly readdress in the January order the subject of IFG's status as a forfeited entity, given its earlier exclusion. Looking at the two orders and the background surrounding them, it is clear that they are dealing with different issues, so the district court did not act improperly by ruling on this issue in January. The original order was a response to Segal's objection that IFG and North Sun, among others, were not tainted by RICO activity and so were not forfeited as part of the RICO scheme. This was true, and the district

---

[6] For ease of reference, we remind the reader that NNNG stands for Near North National Group (which was directly owned by Segal), and NNIB refers to Near North Insurance Brokerage.

[7] The record does not suggest that any party acted in bad faith or attempted to mislead the district court at the time of the October modification order.

court properly agreed. What the district court did not address until January was whether IFG and North Sun were forfeited as assets, a completely separate issue that had not been raised earlier. Again, the district court reached the correct conclusion that they were forfeited. Greater precision by the district court in its October ruling would have avoided this issue, but nonetheless, the district court acted properly in January when it recognized that North Sun and IFG were forfeited as assets of forfeited entities.

### E. Due Process Challenges

Segal next offers two due process challenges to the district court's approval of the IFG settlement. The core of due process is the right of notice and the opportunity to be heard. *See, e.g., United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998); *Michelle's Lounge*, 39 F.3d at 697. Segal first challenges the district court's decision to proceed with the hearing even though he had not received IFG financial statements from Fireman's Fund. The problem with Segal's challenge is that he did not receive the documents because he did not sign a confidentiality agreement. The day after Fireman's Fund learned that Segal wanted additional documentation, it forwarded a confidentiality agreement to Segal's attorneys. Segal's lead attorney was out of town, however, and his various other attorneys did not sign the confidentiality agreement, and Fireman's Fund did not provide the documents. This was a self-inflicted wound, not a deprivation of due process by the district court.

Segal also claims that the district court deprived him of due process by denying his oral motion to continue the hearing on the grounds that his lead attorney was

not available. We review the denial of a motion to continue for abuse of discretion. *See United States v. Vincent*, 416 F.3d 593, 598 (7th Cir. 2005). The district court's exercise of its discretion on granting or denying a continuance is broad. *See United States v. Egwaoje*, 335 F.3d 579, 587-88 (7th Cir. 2003). Here, the district court did not abuse its discretion when it denied the continuance. The district court understood that Fireman's Fund had set a deadline for the settlement and would abandon IFG, as it was contractually able to do, if there was delay. Although Segal did not have the services of his lead counsel, two other able lawyers, including a lawyer from the lead counsel's firm, represented him at the hearing. Further, the hearing was not a surprise, as the district court had informed the parties when it would occur and solicited written objections to the settlement, which Segal filed. Given these persuasive facts, we conclude that the district court did not deny Segal due process by refusing to continue.

## F.   Challenge to the Settlement

Next, Segal challenges the district court's approval of the settlement, contending that the Trustee engaged in a fire sale with Fireman's Fund rather than obtaining fair value through commercially reasonable means.[8] Under RICO,

---

[8] As discussed above, the forfeiture of NNNG and NNIB extinguished all of Segal's interests in North Sun and IFG, which should foreclose his ability to challenge the settlement. *See United States v. Pelullo*, 178 F.3d 196, 202 (3d Cir. 1999). However, as the parties agreed that Segal could attempt to reduce his $30 million liability by the settlement amount (in subsequent proceedings) and thus the amount of money received from the settlement

(continued...)

specifically 18 U.S.C. § 1963(e), a trustee may be appointed "to protect the interest of the United States in the property ordered forfeited." Section 1963(f) further grants the Attorney General the discretion to "direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons." Given that § 1963 authorizes this trust arrangement and grants the Attorney General (through an appointed trustee) discretion to dispose of forfeited assets, the Trustee's actions should be reviewed for abuse of that discretion. *See* Restatement (Third) of Trusts § 50(1) (2001); *see also* William F. Fratcher, Scott on Trusts § 187 (4th ed. 1988) ("To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him . . . the court will not permit him to abuse the discretion."); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989) ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary power.").

Segal challenges both the Trustee's decision to conduct settlement negotiations exclusively with Fireman's Fund and the commercial reasonableness of the settlement itself. The Trustee did not abuse his discretion in either regard. First, the Trustee engaged in appropriate and reasonable negotiations. Fireman's Fund provided all of the underwriting support for IFG and, without Fireman's Fund, IFG would collapse. Fireman's Fund had a complete right to leave the partnership and did not have to accept any substitutes for North Sun. Fireman's Fund also had loaned millions of dollars to Segal and his companies, with the

---

[8] (...continued)
impacted Segal, we will address his arguments about the settlement's reasonableness.

ownership interest in North Sun as collateral, and these loans were in default. To put it mildly, Fireman's Fund was in the driver's seat concerning IFG's future. When Fireman's Fund approached the Trustee with the settlement proposal, the Trustee had to deal with the reality of the situation. While he could solicit other bidders, Fireman's Fund had made it clear it would leave the partnership before allowing another company to step into North Sun's shoes. Likewise, Fireman's Fund made it clear it would leave if a deal were not consummated quickly. The Trustee, therefore, referred the few companies who contacted him about IFG to Fireman's Fund and continued his own court-authorized negotiations with Fireman's Fund. Since any potential suitor would have to meet the approval of Fireman's Fund, this made complete sense. While Segal argues this inhibited the ability to find the genuine or true market price for IFG, Fireman's Fund was in control of setting the sale price based on its contractual power.

Second, the deal produced a commercially reasonable result. Segal challenges the result on the grounds that IFG was sold for basically the cash on hand and that a previous valuation had established a substantially higher value for the company. Both of these contentions are incorrect. The settlement negotiated by the parties and approved by the court basically released $6.9 million in claims that Fireman's Fund held against various Near North companies and Segal personally. Segal asserts that IFG Re had assets of $13 million, so a liquidation would have netted his company $6.5 million, only slightly less than the amount released. Segal argues that, if he could receive almost the same amount simply from liquidation, the sale price should be much higher. Segal ignores several crucial facts. First, Fireman's Fund could have ended its support for IFG, liquidated the company for its half, and then pursued its

legal remedies to collect on the defaulted loans. In the best case scenario for Segal, Segal and North Sun would be engaged in pricey litigation for several years over these loans; in the worst case, Fireman's Fund would get its half of the company and control over North Sun, which was pledged as part of the loans, while Segal and the Trustee would get nothing. Second, the relevant insurance laws required $2 to $3 million dollars to be reserved for several months during any liquidation in order to satisfy any liabilities. Segal simply could not have obtained $6.5 million at the time of the settlement by ending the partnership. Any winding down period would tie up substantial assets for at least a few years, as well as incur administrative and legal costs.

Segal's argument based on a prior valuation of the company is also flawed. Segal argues that a valuation prepared before his conviction properly set the value of IFG and that no subsequent valuation was performed to show a proper value. Obviously, the major problem with any argument that the pre-conviction valuation set the proper price is that it did not and could not take into account the massively changed circumstances confronting IFG. Segal had been convicted. North Sun was no longer supplying any of its bargained for services. Fireman's Fund threatened to end all underwriting support for IFG. All of these circumstances would adversely affect a valuation. More-over, attempting to value IFG during the settlement negotia-tions would have been useless. As noted, Fireman's Fund had the power to end IFG by withdrawing its support and had repeatedly expressed that it would do so. Fireman's Fund was the only entity that could set a value because it was the only possible bidder.

Given Fireman's Fund's control over the process, the settlement negotiated by the Trustee, Fireman's Fund,

and the government was admirable. Fireman's Fund received a going concern in IFG, while the Trustee and Segal obtained nearly $7 million in relief on claims against them. This was a fair and commercially reasonable deal.

## G.  Takings Clause

Finally, Segal's forfeiture of his rights in NNNG and NNIB, which result in the loss of any interest in North Sun and IFG, dooms his claim under the Fifth Amendment. As the Supreme Court has responded to a previous Takings Clause challenge in a forfeiture case, "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis v. Michigan*, 516 U.S. 442, 452 (1996). Here, the government properly obtained all rights in NNNG and NNIB through forfeiture proceedings. Since North Sun and IFG were wholly-owned by the forfeit companies, they too were forfeited to the government, and Segal cannot succeed under the Takings Clause of the Fifth Amendment.

## III.

The Trustee conducted proper negotiations for the resolution of Fireman's Fund's claims and the transfer of IFG. The Trustee obtained valuable relief from Fireman's Fund's loans in exchange for IFG. The district court reviewed this settlement and came to a sound conclusion—this was a fair deal for all parties. The decision of the district court approving the settlement related to IFG is, therefore, affirmed.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*